PROVOSTY, J.
The defendant John F. McCoy, an experienced contractor in street drainage and paving work, desiring to bid on certain contracts that were being advertised by the city of New Orleans for that kind of work, hut lacking the large amount of ready money that would be needed for carrying out these contracts, proposed to the plaintiff, Dr. George K. Pratt, a man of supposed large means, that the latter join him in the enterprise, on the basis of an equal division of the profits, and Dr. Pratt consented, and to evidence their agreement the parties executed the following instrument:
“This agreement, this day made and entered into by and between John F. McCoy and the Concrete Construction & Contracting Company, both of the city of New Orleans, parties 9f the first part, and George K. Pratt, of the city of New Orleans, party of the second part:
“Witnesseth. that, whereas, said Concrete Construction & Contracting Company has bid on certain repaving and subsurface drainage work, and is about to enter into contract with the city of New Orleans, as follows:
*575 Subsurface drainage contract on Magazine street, from Canal to Julia, about.. $ 32,690 00
Repaving contract on Magazine street, frpm Canal to Julia, about.............. 30,860 50
Subsurface drainage contract on Gravier street, from Camp to Delta, about...... 25,620 00
Repaving contract on Gravier street, from Camp to Delta, about..................... 12,000 00
Subsurface drainage contract on Common street from Magazine to Front, about.. 16,558 00
Repaving contract on Common street, from Magazine to Front, about......... 6,400 00
$124,130 60
“And, whereas, under authority of a resolution of the board of directors of the said Concrete Construction & Contracting Company, adopted May 24, 1907, the said John F. McCoy has entered into an agreement with the said George K. Pratt, whereby, in consideration of the payment to him of one-half of the profits which may be derived from said contracts, the said George K. Pratt will finance the said undertaking and advance such moneys as may be necessary for the carrying on of the same:
“Now, therefore, in consideration of the foregoing, the parties of the first and second parts severally bind and obligate themselves as follows:
“Upon the execution of this agreement the several contracts above referred to, as well as all certificates and payments in connection with the same, shall be transferred and assigned to said George K. Pratt, or to his order, or to such bank as he may select and designate as subrogee.
“Upon completion of each of the aforesaid six contracts, accounts shall be audited, and the net profit or loss upon same shall be definitely fixed and determined by the parties to this agreement, reimbursement being first made of all amounts advanced, and, in so doing, the same shall be taken from the proceeds derived from the property owners’ portion of certificates when issued and collected, and the balance (if any) out of the city’s portion of said certificates, when sold as hereinafter provided, and written acknowledgment shall be given by and to both parties to this agreement as to the existing conditions after auditing.
“All certificates and the cash derived from the sale or collection of the same shall remain in the control of the said George K. Pratt until after the completion and auditing of all of said contracts, to be used by him exclusively in malting payments or in securing funds for the carrying on of said contracts and the work upon the same, or as collateral in connection with the bond required by the city of New Orleans.
“The said George IC Pratt shall have the right, in his discretion, to pledge any and all certificates for advances necessary 'to carry out this agreement, and he shall further have the right to sell a sufficient amount of certificates, representing the city’s portion of payments under said contracts: Provided, that sufficient funds are not derived from the collection of the property holders’ certificates for advances made by him: Provided, furthert that, in selling the city’s portion of said certificates, both parties to this contract do agree as to the price, or, in the_ event of disagreement, that he give written notice to the parties of the first part, designating the particular certificates of the city’s portion that he proposes to sell, the price of the same, and the purpose of said sale, and that said parties of the first part, after such notification, do fail within sixty days to procure and produce a bona fide purchaser for said city’s portion of said certificates at a higher price.
“All material accounts and labor rolls and other ‘necessary incidentals’ shall be charged to and as expenses.
“In consideration of the time and efforts of the said John F. McCoy, as general manager, being given to the carrying on of the aforesaid contracts and their rapid completion, the salaries of the officers of the Concrete Construction & Contracting Company and bookkeeper and office expenses, as may be designated by the said John F. McCoy, shall be advanced to him monthly for account of said company by the party of the second part during the running of the said contracts, and until the final completion of the same: Provided, however, that the total amount so advanced shall be no more or less than the sum of $500 per month, and that it shall be reimbursed to said party of the second part, and may be taken by him out of the profit of the parties of the first part, and may be adjusted in the regular auditing following the completion of each contract: And pro-
vided, further, that said advances shall in no event be made for a longer period than twelve months.
“The said parties of the first part shall furnish the said George K. Pratt their notes for advances in and for pay rolls, materials, and incidental accounts and salaries, etc., monthly, which he may discount or use as he may deem proper, returning the same when, after auditing, it shall appear that sufficient moneys have been realized from the proceeds of said contracts to meet and pay all expense accounts and indebtedness of said Concrete Construction & Contracting- Company.
“In the event of legal services being required in connection with any of the contracts aforesaid, the party of the second part shall have the right of naming and employing the attorney at law who shall be engaged for such purpose.
“The party of the second part shall also have the right to appoint one man to act as timekeeper, pa5unaster, and material clerk, at a salary of seventy dollars per month, whose duties shall be the paying of the men employed, receiving of material, and the keeping of the men’s time. He shall have no authority to hire or discharge, and shall be under the supervision of the manager, John F. McCoy, by whom all bills and pay rolls must be approved before payment. The salary of said appointee shall not be paid from the five hundred dollars per *577 month stipulated for above as salaries and office expenses, but shall be charged to the expense account, and said John F. McCoy shall have the right to discharge said employé if unsatisfactory, and shall, in such ease, notify the party of the second part to replace -with another appointee.
“Itemized reports of materials received, material used, and cost of labor, and all other expenses, will be furnished the party of the second part daily, duly signed by manager and timekeeper.
“After all contracts have been completed and all expenses paid, the net profit derived from said contracts shall be determined and divided as follows: All claims due and all unused material and tools and implements purchased in connection with said contracts shall be fairly appraised, all certificates still unsold and uncollected shall be duly classified, and the amount of the cash balance on hand from the sale or collection of certificates shall be exactly ascertained. One-half of said appraisement and certificates and cash shall be given and belong to said party of the second part under the terms of this agreement, and the remaining half of said appraisement and certificates and cash shall belong to the parties of the first part, subject to reduction for reimbursement to the party of the second part of such amount as may be due him for advances for salaries and office expenses at the rate of five hundred dollars per month, as hereinabove set forth, and of such other sum or sums as the parties of the first part may have, by written acknowledgment, declared to be payable out of their share of the profits to the said party of the second part.
“In testimony whereof, the parties of the first and second parts have hereunto signed their names, at the city of New Orleans, this 12th day of August, 1907, in execution of the foregoing agreement, the same being made in duplicate.
“Concrete Construction & Contracting Co.,
“William Demourelle,
“President.
“John F. McCoy,
“Secy, and Treas.
“John F. McCoy.
“George It Pratt.
“Attest:
“John A. McCoy.
“Jas. McConnell, Jr.”
It is well to mention here that the Concrete Construction & Contracting Company, named in this instrument was practically a mere paper corporation through which McCoy carried on his business of contractor, and to explain, also, that the “certificates” referred to are those which the city of New Orleans gives to contractors in payment for work such as that called for by the contracts in question, and that these certificates are of two kinds — those given for the city’s part of the cost of the work, which are payable out of the city’s surplus revenues in future years, and bear interest, and are therefore in the nature of promissory notes having a long time to run, and those given for the part of the cost of the work borne by the property holders along the street, which are payable cash, and are therefore like sight drafts drawn by the city upon the property holders.
The bids of McCoy, or his company, on the six contracts 'referred to in this agreement, were accepted by the city, and the contracts were duly entered into by said company with the city. They were evidenced by notarial acts. Work under them was to begin within 10 days after notice by the city engineer. The two which were for the subsurface drainage and the repaving on Magazine street, from Canal to Julia, were entered into on August 22, 1907, and were to be completed within 180 and 120 days, respectively, from commencement of work. The four others were entered into on November 8, 1907, and were to be completed within the following number of days from commencement of the work: That for subsurface drainage on Gravier street, from Camp to Delta, within 120 days; that for repaving on same street, within 90 days; that for subsurface drainage on Common .street, from Magazine to Front, within 70 days; and that for repaving on same street, within 60 days.
At the time of the filing of this suit, August 18, 1908, one year after the contracts had been entered into, the two Magazine street contracts and the contract for subsurface drainage on Gravier street had been completed, and the certificates in payment of the work had been received from the city. The contract for repaving on Gravier street was approaching completion, and the certifi *579 cates in payment for the work were about to be issued. The work on the Common street contract had not yet begun, except at the intersection with Magazine street, except, also, that some expenses had been incurred in preparation. It may be well to mention, however, that all the contracts were completed before tbe ease was tried in the lower court.
No question has arisen between the parties in connection with that part of the contract by which McCoy obligated himself to give “his time and efforts as general manager to the carrying on of the aforesaid contracts and their rapid completion.” He did it faithfully and diligently, and so well as to have earned some $40,000 or $50,000 of profits. The differences between the parties have all been brought about by the failure of Dr. Pratt, on the one part, to furnish when and as needed the moneys required for carrying • out the contracts, and the refusal of McCoy, on the other part, to deliver to Dr. Pratt the certificates received from the city. '
The present suit is to enforce specific performance on the part of McCoy in that regard. Originally it contained, also, a demand for the delivery of the contracts, but that demand became functus officio when the contracts themselves became so by the work under them having been completed.
Plaintiff alleges that he is entitled, under the contract, to have the contracts and certificates transferred to him, to be disposed of by him as agreed in the contract; and he prays that the contracts, and those of the certificates which have already been issued by the city, be sequestered and delivered to him, and that McCoy be enjoined from receiving from the city those not yet issued by the city. The writs thus prayed for were issued, and on the next day, August 14, 1908, the sheriff sequestered in the hands of the Hibernia Bank & Trust Company 76 city and property holders’ certificates, aggregating $43,259.10, and also the proceeds of 6 certificates which the bank had collected, amounting to $1,129.88; and on the 19th and 25th of August the sheriff received from Mr. Ansley two other property holders’ certificates, aggregating $785.55, making a total of $45,174.57. The certificates had been deposited by McCoy in the Hibernia Bank to-the joint account of himself and Dr. Pratt. It might be well to mention here that the certificates given inpayment for the work under the two Magazine street contracts had theretofore been issued to McCoy and transferred by him to Dr. Pratt, and are not embraced in plaintiff’s demand.
Defendant’s answer, reads, as follows:
“Now into court, through undersigned counsel, come John F. McCoy and Concrete Construction & Contracting Company, defendants herein, and for answer to plaintiff’s petition deny all and singular each and every allegation therein contained, except what may be hereinafter specially admitted.
/‘Respondents admit the execution of the contract of date August 12, 1907, containing the stipulation as set out and copied in plaintiff’s petition, but show that they are not bound to transfer said certificates and payments, or the contracts mentioned therein, nor are they bound to place said certificates and cash derived from the sale or collection of the same under the control of the plaintiff herein, for the following reasons, to wit:
“That when the contract was executed on August 12, 1907, the plaintiff did not require the transfer of the contract, nor did he make any demands or requests to have said contracts transferred until more than one year after the execution of the contract of August 12, 1907, and until five of said contracts had been completed and were ready for auditing and settlement between respondents and the plaintiff herein; that said Pratt specially abandoned and waived that clause of the contract of August 12th, referring to the transfer of contracts and certificates, etc., and never insisted upon said transfers, until after respondents and said Pratt had disagreements regarding the action of said Pratt in repeatedly violating his contract to furnish funds for the execution of his contract to finance the work being conducted by- respondents.
“Respondents show that from the very beginning respondents had difficulty in getting money from said Pratt, were compelled to delay their work, and had to purchase material on credit, for which, to a great extent, their notes were issued with said Pratt’s indorse *581 ment, which notes said Pratt allowed to go to protest repeatedly, thus ruining respondents’ financial credit and standing; that the materialmen, to whom said notes were given, refused to sell respondents more material, causing delays in the work being conducted by respondents, entailing loss, because respondents had to maintain a large force of employes at great expense while waiting for said Pratt to furnish funds to pay for said material; that the said Pratt pursued the same policy with reference to outstanding accounts, refusing to pay them when due, and delaying their payment to such an extent that respondents were hampered in getting material, thus causing them, not only the loss of their financial credit, but also loss of profits under the contracts they were executing, against all of which respondents frequently and repeatedly protested, to no avail.
“That this state of affairs continued, and respondents continued the execution of their contracts with the city of New Orleans under difficulties, until the latter part of May, 1908, when they had completed • the subsurface drainage contract on Magazine street, and said Pratt had called upon respondents to transfer to him the city certificate and the property holders’ certificates arising under said contract, but nothing being said about the transfer or assignment of respondents’ contracts with the city of. New Orleans.
“That respondents thereupon informed said Pratt that they were perfectly willing to transfer said certificates, but desired assurances from said Pratt that funds would be furnished promptly as needed by respondents, and that said Pratt would cease his policy of delay in furnishing funds and his policy of permitting respondents’ notes to go to protest, and his policy of delaying payment of open accounts, which he was obliged to pay under his contract with respondents.
“That after much negotiation between respondents and said Pratt, and attorneys representing respondents and said Pratt, on or about May 23, 1908, respondents and said Pratt agreed upon a modification and change of the contract of August 12, 1907, which was reduced to writing, after being prepared in rough by attorneys representing both parties, and agreed upon; that after respondents had signed same and passed resolutions to carry same into effect, and tendered them to said Pratt for his signature, he refused to sign the same only on the ground that the trustee appointed under said amendment would not act; that thereupon, while seeking a new trustee, and while still promising to execute said amendment, which provided for the deposit of all contracts and payments thereunder in escrow for the mutual protection of both parties, the said Pratt requested the transfer of the certificates then available, which respondents then and there transferred, upon the distinct understanding that a trust agreement would be executed.
“That as soon as said certificates had been transferred the said Pratt left the city, giving his power of attorney to Mr. J. Overton Pratt in conjunction with his attorney; that the same policy of delay was. pursued by said J. Overton Pratt, who made no effort to collect the property holders’ certificates transferred, and who was financing respondents with money borrowed on the pledge of the collateral transferred by respondents to said Pratt; that respondents repeatedly insisted upon said trust agreement being executed, which said Pratt kept promising to do until the Gravier street contracts were' finished, when said Pratt called upon respondents to transfer to him said certificates arising under - said Gravier street contracts, stipulating to execute said trust agreement if respondents would transfer said certificates, which respondents refused to do, because said Pratt insisted that, under the contract of August 12, 1907, he had the right to place the property holders’ certificates in the hands of his attorney for collection at respondents’ expense, which expense was to have been 5 per cent, on the face value of said certificates, and because respondents, by reason of the actions of said Pratt, feared to have their property rights vested exclusively in said Pratt.
“That respondents thereupon deposited said certificates with the Hibernia Bank & Trust Company, of this city, as trustee, instructing said bank to collect said certificates for the joint account of respondents and said Pratt, whereupon said Pratt filed this suit and sequestered the certificates in question, upon allegations and affidavits which respondents allege to be false and untrue; that just prior to the transactions herein set out, and after the transfer of the Magazine street certificates to said Pratt, the said Pratt, through his attorney, notified respondents that he purposed to sell the Magazine street certificates, and respondents were compelled to enjoin the sale thereof, all going to show that the said Pratt had no regard for his contract obligation and no regard for the rights of respondents.
“That respondents have made every effort to so arrange matters_ with said* Pratt as to thoroughly protect him, as will be shown upon the trial of this cause, to no avail; the said Pratt refusing, since the issuance of the Gravier street certificates, to do anything except demand the absolute custody and control of respondents’ property.
“That since the filing of this suit respondents have tried to prevail upon said Pratt to permit the sheriff to collect the property holders’ certificates sequestered, which he has refused to do, respondents being willing, and having expressed their willingness, to have the funds so collected utilized according to contract; but said Pratt has refused to permit the sheriff to collect said certificates, thus showing that respondents’ interests would not be safe in his hands.
“That said Pratt knew and was informed, at the time of the issuance of the writ of sequestration, that respondents only desired to have the property put in the hands of a trus *583 tee for the mutual protection of all parties, and knew that said certificates had been deposited with the Hibernia Bank & Trust Company, and knew that the allegations upon which said writ of sequestration was issued were untrue.
“That, because of the foregoing,, as will be amply demonstrated on the trial of this cause, respondents are unwilling to transfer said certificates to said Pratt, but are entitled to have an auditing and accounting and final settlement between respondents and said Pratt, and to have said auditing, accounting, and settlement conducted under the supervision and under the eye of this honorable court, in order that full justice may be done in the premises, and for which, as plaintiffs in reconvention, they demand; that all of the contracts have been completed, except the Common street contract, which said Pratt has refused to finance, and in which he can have no interest, and a full and final settlement can be had between the parties hereto, and which respondents and plaintiffs in reeonvention demand as their right under the law.
“Wherefore respondents pray that the writs of sequestration and injunction be dissolved, reserving respondents’ right to all damages sustained thereby; that there be judgment in favor of respondents, and against said Pratt, rejecting his demand; and that on respondents’ reconventional demand there be judgment in their favor, ordering a full, final, and complete auditing and accounting under the supervision of the court of all the contracts, and that the respective rights of all parties be fixed after due hearing, and such judgment thereon rendered as in justice and in equity the court deems proper.
“And respondents and plaintiffs in reconvention pray for all general relief.”
The trial in the lower court consumed months, and has resulted in an enormous record, of which- 4,247 pages are taken up by the testimony.
The learned trial judge in an elaborate and painstaking judgment has gone over the case in great detail. He found that the real intention of the parties had not been that the contracts and certificates should be transferred to Dr. Pratt, but that the contracts should not be transferred at all, and that the certificates should be transferred to some trustee, to be held subject to the conditions of the contract. He found that such had been the interpretation placed upon the contract by the parties themselves, as appeared by their manner of carrying it out, and especially as appeared from the documents of date November 8, 1907, April 4, 1908, and April 12, 1908, hereinafter referred to. He found that Dr. Pratt had been continuously in default, almost from the very beginning, on his obligation to finance the execution of the contracts, and therefore had at no time been, and was not now, in a position to exact specific performance from McCoy. He- found that McCoy had been entirely justified in depositing the certificates in the Hibernia Bank to the joint order of his company and Dr. Pratt, and that the sequestration had issued without good ground. He agreed with defendants that the accounting and settlement between the parties should be had in court in this suit. He rejected plaintiff’s demand, and sustained the reconventional demand for an accounting, and ordered such an accounting to be had, and appointed an expert to audit the accounts.
We agree with all these findings, except that we think the parties contemplated that the certificates should be transferred to Dr. Pratt, and so made their contract; but we think they subsequently modified the contract in that respect. On the case as a whole, we have reached the same conclusion as the learned trial judge, and shall affirm his judgment. Indeed, were it not that so much feeling exists in the case, both between counsel and the parties, and that the case seems to be considered by all connected with it as of so very great importance, we should simply adopt the reasons for judgment of the learned trial judge, which appear to us as satisfactory as any we ourselves c-an give, if not more so, in view of our less familiarity with all minor details of the case, especially that a more mixed-up, cart before the horse, topsy-turvy mass of evidence than that in this case would be hard to conceive of, and practically unindexed at that
Before consenting to enter into the contract, Dr Pratt had exacted of McCoy, and *585 been furnished, estimates of the money that would be needed for financing the enterprise; and the figure of $124,130.60 fixed in the contract had been arrived at after close figuring. McCoy testifies that he told Dr. Pratt that some $70,000 to $90,000 of ready money would be required, and that Dr. Pratt had answered, “I don’t care for that; I can get the money,” and that Dr. Pratt had represented himself to be worth $700,-000, and to be assessed for $395,000.
After Dr. Pratt and McCoy had agreed upon their contract, Dr. Pratt referred McCoy to Mr. McConnell, Dr. Pratt’s attorney, to draw it up. Mr. McConnell, testifies that in so doing he had an eye exclusively to the interest of Dr. Pratt; that McCoy was a stranger to him in the matter. Dr. Pratt testifies that in the drawing up of the contract “the one interest to be protected was his own.” McCoy was not represented by counsel at the drawing up of the contract.
Work on the two Magazine street contracts began as soon as the notarial act of date August 22, 1907, evidencing them, had been executed with the city. In fact, McCoy had made arrangements by anticipation with the materialmen who were to furnish the piping, iron castings, stone, sand, gravel, cement, and other materials that would be needed in the work.
Dr. Pratt defaulted almost from the very beginning in his obligation to furnish the money. His obligation was to furnish the money promptly as needed, and to maintain McCoy in the assurance that it would be forthcoming whenever needed. Instead of this, what money he did furnish, he furnished haltingly and tardily, and kept McCoy in a constant state of painful uncertainty as to whether the funds wherewith to meet expenses would be forthcoming at all. He required the force of men to be kept down to a minimun, in order that the pay rolls to be met at the end of each week should be as small as possible. He furnished only by driblets, and never in full, the $500 per month agreed to be furnished for McCoy’s office expenses, the effect of all of which was to bring worry and annoyance to McCoy, to discredit his company as a purchaser of materials, to retard the work and cause interruptions and delays in it, and to increase expenses and reduce profits.
At the beginning of November, 1907, Dr. Pratt frankly admitted to McCoy his inability to procure money, and requested him to consent to meet the expenses of the company by giving the notes of the company with his (Dr. Pratt’s) indorsement. How much money had then already been furnished the record does not enable us to say. McCoy had, by this time, become distrustful of Dr. Pratt’s financial standing. He had informed himself, and ascertained that Dr. Pratt was assessed for only some $1,300, that all his property had been transferred to a corporation, which was assessed at some $300,000, and of which Dr. Pratt owned 51 per cent, of the stock. He therefore became desirous of obtaining an amendment to the contract in the matter of the transfer of the certificates to Dr. Pratt, and with that end in view made the following written answer to the request of Dr. Pratt, just referred to:
“New Orleans, November 7, 1907.
“Dr. Geo. K. Pratt, 410 St. Charles St., City.
“Dear Doctor: Referring to the conference had between us this day, wherein you informed us of your failure to discount the $6,000 note issued to you on the 22d of last month, and your financial inability to furnish and advance to us an approximate sum of $700 for pay rolls, which is payable on Saturday, the 9th instant, and your inability to advance $400 with which to pay the city notary for drawing up our four contracts in Gravier and Common streets, and requesting us to issue our notes with your indorsement for the sum of $400 in payment of said notary fee for the said contracts, and further requesting us to use our endeavors to withdraw the deposit funds with the city treasurer, in order to meet and pay the said pay rolls— referring thereto, we beg to advise that the above request to issue our notes in payment for accounts is utterly contrary to the contract be *587 tween us of August 12, 1907, which, upon the faith of same, and upon the statements you made to us that you had in hand sufficient moneys to advance funds with which to enable us to carry on and complete the contract between us of August 32, 1907, and upon'the faith of which we entered into the six contracts with the city of New Orleans, and do herewith insist and demand that you comply thereto, and that you advance us the necessary funds to pay the said notary fee for the Gravier and Common street contracts. We will not agree to issue our notes in payment of accounts, unless we can protect such notes and our own interests; but, if you will agree to make a written amendment to the contract of August 12, 1907, and strike out paragraph 3 therein that relates to ‘all certificates and cash derived from the sale or collection of the same shall remain in the control of said Geo. K. Pratt,’ etc., then we will issue our notes with your indorsement, and, as all the certificates are issued to us, the same shall bo deposited in bank for the joint account, and collection from property owners shall be credited to your account. We can satisfactorily arrange for the pledging of said certificates for the balance on advances, which is- the understanding between us. We will draw up the amendment for all signatures at once accordingly.
“Yours very truly,
“Concrete Construction & Contracting-Company.
“John F. McCoy, Kec’y-Treas.
“John A. McCoy, Ass’t Sec’y.
“P. S. — We will endeavor to withdraw the deposit funds for Saturday pay roll, etc.”
Dr. Pratt denies having received this letter, hut admits that the statements therein contained are true.
McCoy' claims that on the next day the following instrument, known in the record as “McConnell X,” was executed by Dr. Pratt:
“November 8, 1907."
“Mr. John F. McCoy, General Manager.
“Dear Sir: You are correct in your understanding and report to your board and associates that it is our agreement that we shall deposit all certificates in bank for joint account from the six contracts as issued to your company, and my advances shall be paid from collections of property owners’ certificates, and upon the completion of the contracts we shall divide the profits equally in city certificates between us after auditing.
“Geo. K. Pratt, M. D.
“John A. McCoy, Asst. Secty.
“November 8, 1907.”
Dr. Pratt denies that he signed this instrument, although he admits that the signature looks very much like his. As a matter of fact, the company’s notes indorsed by Dr. Pratt were from that time on given to the materialmen in settlement of their bills, and Dr. Pratt admits the genuineness of the following two letters, which go to show that the parties must have had such an agreement as that expressed in this letter of November 8, 1907:
“New Orleans, April 4, 1908.
“To the Concrete Construction & Contracting Company and John F. McCoy:
“Dear Sir: You are hereby authorized by me to negotiate with party or parties to sell city certificates for the Magazine and Gravier and Common street contracts, the proceeds and funds to be deposited for the joint account between us.
“Geo. K. Pratt, M. D.”
“New Orleans, April 24, 1908.
“To the Concrete Construction & Contracting Company and John F. McCoy, City:
“Gentlemen: I beg to acknowledge the verbal message and report referring to the estimates made by A. M. Blamphin, assistant city engineer, relating to the certificate for the subsurface drainage contract work in Magazine street, from Canal to Julia, and I do agree with you, and am of the opinion that you were entitled to more consideration than has been shown in the premises, and beg further to inform you that, owing to the financial depression and my shortness of funds at the present time, I urgently advise and request that you accept the above-named certificate, whereby we can make some satisfactory arrangement wherein we can pledge same to the bank as collateral, for the purpose of securing funds for the further carrying on and completing all of the other contracts as entered into between us, dated August 12, 1907.
“Yours truly, Geo. K. Pratt, M. D.”
On May 1, 1908, McCoy wrote to Dr. Pratt the following letter:
“New Orleans, La., May 1, 1908.
“Dr. Geo. K. Pratt, 418 St. Charles St., City: “Dear Sir: We beg to call to your special attention the following accounts past due, due, and to become due, and in this connection beg to further call to your notice the facts, which are, as you will readily note herein, that a great many of these material claims and salaries and office expenses accounts are very old and have to be retired; and, owing to your repeated carrying over and defaulting to advance us the money necessary to pay these accounts then due, has greatly increased the labor rolls, as well as delayed the contracts, with a large running expense going on for each day longer we are on these contracts (notwithstanding you compelled us to agree to complete these six contracts in twelve months), as you know we *589 ar running short of nearly all classes of materials required, and some materials we are entirely out of, and we are in need of (small granite blocks, curbing), and have 'been, and we are now delayed waiting on materials.
“The material dealers are refusing to furnish or deliver to us further materials until their old accounts are paid, all of which is only increasing the cost and delaying the contracts further. This slow dragging along unsatisfactory manner of advancing money to carry on the contracts has been going nearly eight months, and you informed us last December that you would advance us all moneys to pay all the outstanding accounts after February 1, 1908; but you have failed to do so, and matters are getting worse. Therefore the necessity compels us to demand from you immediately the moneys necessary to settle and pay all the past-due accounts to date (which amounts you have already been furnished with), and your failure to comply to this immediate demand that you advance to us the moneys necessary to settle and pay the notes and accounts before the day and dates as follows, viz.: J. E. Manion & Co., Hay 1, 1908, which you have been previously notified of, $278.57; Orleans Gravel & Sand Co., due May 8, 1908, $275.40; Hugo & Sullivan, due May 8, 1908. $79.05; M. Kenney, due May 20, 1908, $77.50; A. L. Bear, due May 20, 1908, $53.50; Alfred Hiller Co., Ltd., due May 22, 1908, $864.32 — and the aforesaid notes are due and are payable on the day set forth,' which accounts wore long past due before liquidated by notes.
“Beg further to advise you of the past-due notes and due acc.ounts which we herewith demand from you to advance’ us the money in order that we can settle and pay all the said claims in full on or before our (suppose) pay day, the 25th inst., as follows, viz.: Record Oil Co., $27.75; Southern Vehicle Co., $19.05; Jeff Collins, $31.85; J. E. Manion & Co., $9.60; P. Codman Ford, $13.70; Drs. Pord Brothers, $14.50; Woodward-Wright Co., $29.-35; Willis & Cook, $34.15; Louisiana Cypress Co., $700.9S; J. H. Menge & Sons, $91.61; Alfred Hiller Company, $667.36; Venable Bros.', $17.25, due since December; J. -W. Thompson, $109; C. G. Sehultze, $5/45; Pine Mountain Granite Company, $543.75; T. G. Stanton, $45.01; Breide Wagon Company, $33.50: Barber Asphalt Paving Company, $216.56; Carolina Portland Cement Company, $1,061.26; P. H. Koretke, $14; James Kelly, $19.76; M. P. Boland, $15.10; Haubtman & Loeb, $2.18; Edw. Thompson, $1.80; J. H. Murphey, $10.59; W. H. D. Brooks, $20; O’Connor Wagon Co., $1.75; Jahncke Navigation Co., $6; Zimmerman Supply Co., $42.40; G. Pitard & Sons, $4.73; Lafayette Warehouse Co., $22.95; Orleans Gravel & Sand Co., $42.-75; amount of $200, and interest, $7.10, for the payment of note issued to William V. Seeber, city notary, dated November 8, 1907, payable December 8, 1907, for drawing up city contracts between us and the city of New Orleans, and which note is still unpaid at this date; and balance due us on account of salaries and office expenses, amounting to $2,049.81. We herewith notify you and make a final demand for the sum of $6,094.49 on or before the 25th instant, in order that we can pay the above accounts, and notify you that we do protest against any further continuance, defaults, and nonpayments of these accounts; and, unless you satisfy the demands for the above amounts on the 25th instant, we will, without further notice, again place you in default thereon. We beg further to advise you, and do again herewith notify you, that the following list of notes have been issued, and are. outstanding, and are payable on the following days and dates and for amounts herein stated, which accounts were long past due before notes were given: H. H. Solomon, due May 25, 1908, $15; Willis & Cook, due May 27, 1908, $572; United States Cement Company, two notes for $229.33 each, due on May 15, 1908; Venable Brothers, due May 26, 1908, for $660.46 (due on contract since December and January); note issued for office expenses, due June 4,1908, $175; J. H. Menge & Sons, due June 1, 1908, $262.80; P. H. Bayley, due June 20, 1908, $1,-322.21; Grasser Contracting Co., due June 26, 1908, $612.37; W. C. Beck, due June 6, 1908, $152.96; James Demourelle & Sons, due July 21, 1908, $466.03; Wm. Demourelle, due July 21, 1908, for $150.
“We herewith demand that you furnish and advance, to us the above amounts as above set forth on or before the dates as stated when they will become due and payable, as these accounts were long past due before the above notes were given, without further notice, and these demands herein made are intended as final demands; and, in the event of your failure to comply with each and every one of these demands in full on or before the dates specified, we will consider and place you in default without further notification, and trust you will gu-ide yourself accordingly, and that you will not further cause us any further delays and inconveniences.
“Yours truly, John P. McCoy.
“Secretary-Treasurer Concrete Construction & Contracting Company.
“P. S. — Please send over by John the check for J. E. Manion & Co., for $278.57, and add on $3.76 interest due on same; for, if we don’t pay him to-day, he will enter suit tomorrow without fail, after note is protested for nonpayment.”
The situation complained of in this letter continued to grow worse. Towards the end of that month things had come to a crisis. The certificate referred to in the letter of April 24, 1908, copied at page 1019 of this opinion", amounting to $32,075.58, was about to be issued by the city; the company’s debts had accumulated to over $13,500; the com *591 pany had. become entirely discredited, as a purchaser of materials; and Dr. Pratt and McCoy had had a falling out.
Dr.' Pratt, whose health had become .seriously impaired, as the result, he says, of ptomaine poisoning, turned the whole matter over to his attorney, Mr. McConnell, to straighten out for him, and went to Pass Christian, Miss., for recuperation. Several conferences took place between Mr. McConnell, representing Dr. Pratt, and Mr. Ansley, representing McCoy and numerous letters passed between the parties. McCoy was demanding money wherewith to meet the debts of the company and its pressing needs, and Mr. McConnell was insisting that McCoy consent to transfer the certificates to Dr. Pratt as soon as they should have been issued by the city. McCoy was offering to deposit the certificates in any bank Dr. Pratt might designate, in trust for the joint account of the parties, subject to the terms of the contract. This was agreed to, and an instrument to evidence the agreement was drawn up and duly signed by the parties; the Citizens’ Bank (Dr. Pratt’s bank) being designated as trustee. That bank, however, refused to undertake the collection of the property holders’ certificates, unless allowed to employ its own attorney for the purpose, and to this Mr. McConnell would not consent. A deadlock ensued. The parties then, on May 26, 1908, made mutual peremptory demands upon each other, putting each other in formal default.
On that same day Mr. McConnell addressed to McCoy’s Company the following:
“Gentlemen — I am instructed by my client, Dr. Geo. K. Pratt, to demand of you immediate compliance with your obligations in the performance of the contract made 'between you and him on August 12, 1907, and particularly with reference to the assignment to him of sucia certificates as are now prepared and ready for issuance by the city of New Orleans under any of the eonta'acts referred to in your agreement. It is imperative that the certificates be placed in the hands of Dr. Pratt at once, in order to enable him to carry out his obligations under his contract with you, and this must be done without an hour’s delay; otherwise, heavy damages and loss will result. The matter of the proposed amendment to the contract can be taken up later for further discussion and adjustment, but must not now be permitted to stand_ in the way of the immediate assignment and issuance to Dr. Pratt of the certificates above mentioned. This letter is intended as a final demand and putting in default.
“[Signed] Jas. McConnell, Jr.”
To this Mr. Ansley on the same day answered:
“Dear Sir: Tour favor of May 26, 1908, addressed to the Concrete Construction & Contracting Company and John E. McCoy, has been handed me for reply.
“We have no objection to assigning to Dr. Pratt such certificates as are now prepared and ready for issuance by the city of-New Orleans, approximating $39,000, provided Dr. Pratt will agree to the proposed amendment under discaassion for the last three days relative to the appointment of a trustee, to whom shall be assigned all further payments and certificates arising under said contracts and according to the terms stated in said agreement, a copy of which you have in your possession. My clients have no desire to hamper Dr. Pratt in his efforts to finance the contracts but desire the ample protection provided in the proposed amendments against eventualities.
“Tours truly, H. M. Ansley.”
To this last letter Mr. McConnell on the same day answered:
“Attorney for the Concrete Construction &
Contracting Company and John E. McCoy:
“Dear Sir: Replying to your letter of even date, just received, I beg to say that I have submitted the same to my client, Mr. Pratt, by whom yow proposition is rejected. I refer you again to the communication addressed by me to your clients this morning, which is now supplemented to this extent only: That it is understood that compliance by them with the demands made shall not be considered as a precedent, or as in any way prejudicing their rights under the terms of the contract of August 12, 1907. If above is acceptable, please inform me at once, stating the hour to-day at which the certificates will be assigned and delivered to Dr. Pratt. My client is now waiting in my office for your reply.”
In these letters, Mr. McConnell says that “the matter of the proposed amendment to the contract can be taken up later for discussion and amendment,” and that “it is understood that compliance with the demands made [for the delivery of the certificates to Dr. Pratt] shall not be considered as a precedent, or as in any way prejudicing their *593 rights.” In that connection Mr. McConnell testified, as follows:
“I have a very clear recollection in a conversation that I had with Mr. Ansley of telling him that, in my opinion, there would. be no difficulty at all in bringing about a modification of that agreement with reference to having a trust agreement executed, and that the matter would be left entirely in my hands, or in the hands of Dr. J. Overton Pratt, in the absence from the city of Dr. George K. Pratt, and I also stated to him that he might go ahead with the transfer of the city certificate, with the assurance that we would be willing to have a trust agreement made; but as to anything which would lead him for one instant to believe that I would so foolishly and so asininely bind myself that I would promise or agree that any trust agreement he might formulate would be the trust agreement which we would sign, why, such an idea never for a moment entered my mind. It was my duty as a lawyer to protect the interests of my clients, and I was perfectly willing to come to some amicable understanding for a trust agreement by which the certificates would be placed in the hands of some third person or some bank.
“This matter with reference to having some modification of the contract of August 12, 1907, between Dr. Pratt and the Concrete Construction & Contracting Companj^, was prolonged over a considerable period of time on account of the failure of the first effort in the latter part of May to have the Citizens’ Bank take possession as trustee under an agreement and proposition which would probably have been carried through, with certain modifications, if the president of that bank had not insisted upon having his own counsel act, not merely as his adviser, but as the attorney for the collection of the property holders’ certificates. There was no agreement, no final and definite agreement, arrived at between myself and Mr. Ansley, or between myself and any body else representing the Concrete Construction & Contracting Company, with reference to the form of the modification of this clause in the contract of August 12th; that is, with reference to a trust agreement. There were several modifications or trust agreements proposed, but none actually consummated or agreed upon _ in a binding way, enforceable as a thing to which one party was absolutely committed, or, at any rate, as a thing to which my side was absolutely committed.”
Mr. Ansley, answering a question put to him by Mr. McConnell, testified, in the same connection, as follows:
‘You told me that the Citizens’ Bank would not take the trusteeship unless their own personal attorney acted, and that matters were off for the time being, and that Dr. Pratt’s pressing illness compelled him to leave the city, and that immediately upon his leaving you would take the matter up with me and secure another trustee and execute an agreement. Therefore I did not refer to the completed agreement, and the further reason was because I had an absolute promise from you, when you told me that the Citizens’ Bank would not act as trustee because they desired to employ their own attorney, and nobody else’s attorney, and that, as soon as Dr. Pratt left the city, the agreement would be executed.”
McCoy testifies that he consented to transfer the certificates only on the positive assurance given him by Mr. Ansley that it was fully understood with Mr. McConnell that a trust agreement would be executed. In his letter consenting to the transfer he said:
“We will only assign the certificate of $32,-075.58 to-morrow, which, and as our attorney has advised that your attorney has agreed to execute the trust agreement and appoint some bank to act with him, the assignment being only made upon the understanding and agreement that, in doing so, we do not prejudice or waive any of our rights and claims we have in the premises; nor do we release you from your obligations or defaults, or for any claims we have against you for increased expenses, labor, losses, damages occasioned us through your default, which we do hold you for, which cannot be adjusted and settled now, and must be settled and accounted for in the final settlement. We demand the necessary moneys, as per estimate, for the carrying on of the Magazine street repaving and Common street contracts immediately, and we will only assign with the agreement that same shall not be considered as a precedent.”
In the same connection, Mr. McConnell, further on in his testimony, says:
“I will further state that, with reference to this proposed trusteeship with reference to the holding of certain certificates, there was always an outside understanding between the parties with regard to the fact that, even though we were to agree and finally determine upon a bank to take charge of the collection of .the said certificates, there was to be accompanying said agreement a further stipulation as to the withdrawal of amounts collected for the reimbursement of Dr. Pratt. That matter had never taken any definite form as to a final agreement between the parties, but there was an understanding between us to the effect that, if we ever entered into a final agreement with regard to the amendment, that amendment should be supplemented by an agreement directing the trustee to pay over certain proceeds arising from the collection of the certificates for the reimbursement of Dr. Pratt of the amounts that had been advanced by him under his contract with the Concrete Construction & Contracting Company of date August 12, 1907. *595 Without that understanding there never could have been any agreement with reference to the alteration of the contract subjecting his rights, clearly expressed in that contract of August 12th, to the further impediment of being required to have the signature of Mr. McCoy or the Concrete Construction & Contracting Company before he could withdraw funds to cover the amounts actually advanced by himself. As I say, this was the clear understanding between the parties at all times pending the discussion of the proposed amendment to the original contract. After this matter fell through with reference to the Citizens’ Bank taking charge of the collection of the certificates and disposing of them in accordance with the terms agreed upon by the parties, I personally made known, either to Mr. Ansley or to his client (I forget now exactly to whom I was speaking at the time), the fact that I had never in any manner relinquished my right under the contract of August 12, 1907, to be appointed by Dr. Pratt as the attorney for the collection of the certificates, and that, although we had agreed upon certain proposed forms of amendment in which no attorney was named, and by which the bank which might be selected as trustee was directed, as well as authorized, to employ an attorney, and to pay him his 09m-pensation out of the amounts so collected, without stating the sum to which he would be entitled for such services, it was always my idea to insist that the bank which should accept such trusteeship would carry out the original idea as expressed in the contract of August 12th, and which would permit my client, Dr. Pratt, to name his own counsel — namely, myself — as the attorney to be selected by the bank in question for the collection of the certificates.”
On June 10, 1908, Mr. McConnell, by pledging the $32,075.58 and paying a bonus of $1,000, procured $1S,500 from the Hibernia Bank & Trust Company. Out of that sum, he, on June 12, 1908, turned over to McCoy $4,284.08.
Mr. McConnell thought that on receiving this money McCoy ought to condone all the past defaults of Dr. Pratt; and accordingly, in drafting the receipt to be given by McCoy, he worded it so as to convey that idea. But McCoy was unwilling to waive these past defaults, but, on the contrary, was determined to hold Dr. Pratt strictly to the legal consequences flowing from them, and therefore refused to sign the receipt. The document was redrafted, and still it was unsatisfactory to McCoy, as not excluding with sufficient certainty the idea of waiver. After some two hours of discussion, a third draft was made and accepted as follows:
“New Orleans, La., June 12, 1908.
“Received from Dr. Geo. K. Pratt two checks to the order of the Concrete Construction & Contracting Company, for $1,226.2-4 and $3,057.84, respectively, for the payment by us of certain past-due notes and certain due and past-due open accounts, as per statement rendered by us; there being no further sums past due at this date.
“Concrete Construction & Contracting Co., “Per John F. McCoy,
“Secretary and Treasurer.”
Three days after the execution of this receipt, on 15th of June, 1908, Mr. McConnell wrote to McCoy that Dr. Pratt, “for the purpose of obtaining advances necessary to carry out his said agreement with you and to make payments required of him • thereunder, and, further, for his personal reimbursement of amounts advanced by him,” proposed to sell the city subsurface drainage certificate of $32,075.58 at 80 cents on the dollar, unless within 60 -days McCoy secured a purchaser at a better price. The right thus claimed for Dr. Pratt to attribute the proceeds of the certificate to the reimbursement of his advances, instead of holding them to meet the needs of the execution of the contracts with the city, made McCoy all the more desirous and insistent that the proposed trust agreement should be executed.
The real obstacle to the consummation of this trust agreement was the insistence of Mr. McConnell to be the attorney to collect the property holders’ certificates, and his claim of the right to charge a 5 per cent, commission for making the collection. McCoy denied that the services of an attorney were needed, or that so large a commission would be just, for collecting these certificates, which were in the nature of sight drafts secured by lien upon the property of the drawees.
McCoy wrote to Dr. Pratt at Pass Christian, complaining of this, as he thought, unjustifiable attitude of Mr. McConnell; but *597 Dr. Pratt would not open the letters. After Dr. Pratt’s return to the city, McCoy sent his son, Wm. A. McCoy, and a friend, Mr. Donnes, to see Dr. Pratt about the matter. These gentlemen telephoned to Dr. Pratt, asking for an appointment. Dr. Pratt refused to make an appointment. They then went to his residence, and found him out on the lawn. He refused to confer with them— said he did not “care a damn” what Mr. McConnell charged. When questioned about this as a witness, he said that he was very indignant on that occasion at his privacy having been invaded.
In accordance with his promise to deliver to Dr. Pratt the property holders’ certificates to he issued by the city for the same Magazine street subsurface drainage work for which the city certificate of $32,075.58 had been issued, McCoy delivered these certificates to Mr. McConnell as soon as the city issued them to him. This was on May 27, 1908. No effort whatever was made to collect these certificates; and this, although Dr. Pratt, or Mr. McConnell for him, was, for lack of funds, defaulting on his obligation to furnish money for carrying out the contracts.
While the parties had thus fully agreed that the contract would be modified, so as to deposit the certificates in trust, instead of putting them in the uncontrolled possession of Dr. Pratt, nothing final was ever done in that regard. Mr. McConnell applied to other banks to act as trustee; but his insistence upon being the attorney to collect the certificates always stood in the way, and things remained in that condition until the beginning of August, 1908, when the two contracts on Gravier street were completed and the repaving of Magazine street was nearly completed, and the certificates for the work were about to be issued, and another crisis came. Mr. McConnell insisted that the certificates should be turned over to Dr. Pratt as soon as issued; and McCoy announced positively that he would not do so, hut would deposit them in bank in trust.
McCoy received the certificates from the city, and deposited them in the Hibernia Bank & Trust Company to the joint account of himself and Dr. Pratt, taking from that institution receipts reading as follows:
“Received of Hubert M. Ansley, attorney for the Concrete Construction & Contracting Company, at Now Orleans, Louisiana, this the 12th day of August, 1908, thirty-nine (39) property holders’ certificates for subsurface drainage on Gravier street, and thirty-nine (39) property holders’ certificates for repaving of Gravier street, which certificates are received for collection for the joint account of the Concrete Construction & Contracting Company and Dr. George K. Pratt; the proceeds, when collected, to be held subject to the joint written order of the Concrete Construction & Contracting Company and Dr. George IC. Pratt.
“The fees for collection will be one per cent. (1%) of the total amount collected, plus expense of clerical work necessary to enforce collection.
“Hibernia Bank & Trust Company,
“[Signed] Wyatt H. Ingram, Jr.,
“Trust Officer.”
On thus depositing these certificates, McCoy duly notified Dr. Pratt of his having done so. On the 10th of August, 1908, Mr. McConnell made a peremptory demand. This time he demanded the transfer, not only of the certificates, but also of the contracts; and on the 13th of August he brought the present suit, and, as already stated, sequestered the certificates which had been deposited in bank. In the one day or so, during which the hank had the certificates for collection, it collected the $1,129.88 which it turned over to the sheriff.
Pending the suit, the work under the contracts went on. The expenses up to August 29, 1908, were met in part with money received from Dr. Pratt, and in part with money withdrawn by consent from the sequestration.. At that date, August 29, 1908, Dr. Pratt refused to have anything further to do with the contracts. The repaving on Magazine street was yet incomplete, and the Common street work had been only begun. *599 How much of it had been done we have been iviable to. ascertain from the transcript. In a letter of Mr. Ansley the statement is made that $2,500, had been expended on it. This would have been about one-sixth of the whole. McCoy testifies that only the intersection with Magazine street had been done. The contracts were completed with money secured otherwise than from Dr. Pratt.
In view of the important part which the defaults of Dr. Pratt play in the case, and in view of the contention made that all of his defaults occurred prior to August 12, 1908, and none subsequently, and that those prior to that date were condoned, as shown by the terms of the receipt executed on that date, copied at page 1022 of this opinion, it may be well that we do not content ourselves with referring merely in general terms, as heretofore done, to these defaults, but give particulars. We will add, however, that to give all the particulars would lengthen this opinion beyond measure, and that those which we now proceed to give are taken more or less at random, and that we shall have to give them disconnectedly, as we come across them; it not being possible, in our limited time, to prepare a connected or chronological statement. Already, as things are, this ease has taken 10 times more than its just share of the time of the courts.
Sutton, the foundry man, who furnished the castings for manholes, catch-basins, etc., testifies: That his contract with the company required payments to be made on the 25th of each month, either in cash or by 30, 60, or 90 day notes with satisfactory indorsement. That the deliveries for September, 1908, amounting to $109, were paid for in cash; that for the deliveries in October and November, 1907, amounting to $1,272.89, notes were given, and that the payments were made as follows: On November 26th, $300; on December 5th, $200 and a 30-day note of Dr. Pratt for $500; on January 9, 1908, $100, leaving a balance of $122.89. That because of the nonpayment of his bills he made no deliveries during 10 days, from December 20th to December 30th, refusing to do so until the amounts past due were paid. Testifying in general terms, he said that the way the business would be carried on with him was that notes would be given, and that, when these fell due, some cash would be given and the note or notes renewed, and that this manner of doing business was unsatisfactory to him, and he refused to make deliveries, and told the Mc-Coys that' if payment was not made he would lien the work, and that he did at one time think of recording a lien upon the work, and with that end in view went to the city hall and found that several liens had already been recorded. Sutton’s refusals to make deliveries led the company to serve upon him, on August 20, 1908, a peremptory written demand, in which occurs the following:
“On Friday, July 3, 1908, you were given an order and directions as to the style of castings that are wanted for Arcade alley. You accepted, and agreed to deliver castings on July 7, 1908. Forty-seven days have elapsed, and still we are waiting for them. You informed us, 10 days later, after receiving the order for these castings, the reason you did not deliver these castings was that Dr. Pratt was so delinquent in making payments on Magazine and Gravier streets contracts that you wanted to get from Dr. Pratt a letter stating that the payments would be made as contracted for every 30 days. The property owners and the public using the thoroughfare are inconvenienced by this delay, and it also delays us in receiving payments, and puts us to very large expense, and the city engineer now demands that we furnish and place the castings in place, and we now urgently request that you please send us your definite answer what you propose doing in the matter.”
To that demand, Sutton answered, on the next day:
“Owing to the manner in which you do business with me, Dr. Pratt failing to live up to his promise by letting one of his notes go to protest, thus putting me to great inconvenience, I refuse to do business, unless I am guaranteed a better settlement. If Mr. John F. *601 McGoy will obligate himself to pay either on a cash basis or every 30 days for such, I am willing to resume business with the company.”
In a letter, of date August 7, 1908, to Mr. McConnell, Sutton uses the expression:
“I don’t want any more running after Mr. McGoy.”
This conveys a correct idea of the extent to which Dr. Pratt’s defaults had discredited McCoy’s Company, and subjected McCoy personally to pursuit and harassment by creditors of the company.
Mr. Sutton, by the way, was a witness called by Dr. Pratt, not by McCoy.
Bayley, the furnisher of the iron pipe for the drainage, did not testify; but from the testimony of the McCoys and of a number of ether witnesses it abundantly appears that he, like Sutton, refused to make deliveries because of nonpayment of his past-due bills. Thus Joseph Barangué, the city’s inspector on the work, testifies that, October 10th to 12th, there was a delay of two days on the Magazine street work waiting for pipes; that on Gravier street there was, from the same cause, a delay of ten days; that on the same street there was, in the latter part of March, another delay of a week from the same cause, and that on the latter occasion he asked Mr. Bayley, whom he happened to meet, why he did not send the pipes, and that Mr. Bayley said it was because he had not been paid; that eight or ten days later there was another delay (he does not say for how long) from the same cause. Cook, the subcontractor, testifies that he was delayed and held back in his work for want of pipes.
Charles Mendelsohn, secretary-treasurer of Alfred Hiller & Co., the gravel, cement, and ■sand furnishers, testifies that notes were given instead of cash, and that the notes were not met; that the first note for $877.22 went to protest; that this was on May 22, 1908, and further deliveries were stopped until June 10th, when the note was paid; that the second note also had to be protested, and that deliveries again stopped. This second note was for $774.75, and was dated May 5, 1908, and was protested on July 6, 1908.
The furnishers of granite blocks, of which ■very large quantities were needed, were Venable Bros., of Alabama. No one of that firm testified; but they, too, stopped deliveries because of the nonpayment of their bills. Joseph A. Cook, the subcontractor on Magazine street, testifying from a contemporaneous memorandum made by him with a view-to a suit in damages which he thought he would have to bring against McCoy’s company for its repeated and constant defaults in furnishing him money and materials as per contract, says : That for want of granite blocks he was delayed as follows: Prom October 9, 1907, to October 17, 1907; from November 28. 1907, to January 3, 1908; from April 27, 1908, to May 5, 1908. The foregoing delays were, as we understand, on the subsurface drainage part of the contract. On the repaving part, he was retarded, from the same cause of lack of granite blocks, as follows: Prom May 7th to May 13th; from May 19th to June 29th. That 3,000 blocks were procured on June 29th, and were laid on that same day, and then that the supply gave out, and a further delay occurred from that day to July 6th. That another delay of four days from the same cause occurred between July 6th and 13th.
Joseph Barangué testified to a delay of three weeks for want of blocks for curbing.
While the money for the pay rolls was supplied more punctually, there was much cause for complaint even in connection with the pay rolls money. McCoy was kept more or less in a constant state of uncertainty as to whether the money to meet the pay rolls at the end of each week would be forthcoming or not. The same subcontractor, Cook, testifies to his having had on more *603 than one occasion to provide the money himself for his pay rolls, because he could not get it from the company as agreed. Joseph Barangué testifies to an occasion, when in order to help out the situation, or, in other words, to meet a pay roll, he went with McCoy and Dr. Pratt’s son to the Western Union Telegraph Company, one of the property holders along the street, and prevailed upon that company to pay, by a sort of anticipation, what it owed, or would owe, for its part in the eventual cost of the paving.
Cook testifies:
“There were continuous delays on the work, first from one cause, and then from another. If we should happen to have sand, gravel, and rock on the work, then there was something else missing that was necessary for us to have.”
Barangué testifies to there having been numerous short delays for want of bricks, gravel, cement, or sand. He says that:
“It was the common talk that the company was financially embarrassed, and the creditors were running around and hampering them in every way. That was a matter outside of my business [he was, it will be remembered, the city inspector on the work], but still I could hear and see it going on, being right there constantly on the ground.”
It cannot be pretended that McCoy was at any time or in the slighest degree responsible for any of these delays. The sole and whole responsibility for them lay with Dr. Pratt’s failure to furnish money. Nothing shows that the furnishers of materials were ever to blame, or were ever slow. Indeed, sometimes the materials were on the cars on the railroad yard, but could not be had simply because the money with which to pay the freight was lacking.
Under the contract, Dr. Pratt was to furnish McCoy $500 per month for his office expenses. The record does not show from what date this $500 per month was to be furnished; but it could not have been later than August 22, 1907, the date of the formal signing of the notarial contracts with the city. McCoy had been giving his “time and efforts” to the work of the contracts some time before that, and yet we find that on May 20, 1908, McCoy had received on account of these office expenses only $835.55, instead of say $4,500, and that June 1, 1908, he had received only $1,559; that on June 2, 1908, he received in part settlement of this office expense account Dr. Pratt’s notes, payable 60 days after date, aggregating $2,000; that this left a balance due of $154.-45, as of date May 20, 1908; that he thereafter received payments on this office expense account, as follows: September 12, 1908, $377.95; October 12, 1908, $19.70— leaving a balance due at that date on this office expense account of $1,598.65. Nothing shows whether the $2,000 of notes given by Dr. Pratt were paid eventually; but presumably they were, or there would have been some complaint on that score.
The amount furnished by others than Dr. Pratt for the completion of the Magazine street contracts was $1,220.13. On December 3, 1908, McCoy’s company was still indebted to 40 different creditors for work done under these contracts; these debts aggregating $2,027.04. And on July 10, 1910; the company was still indebted to 69 different creditors for work done under all the contracts ; these debts aggregating $18,232.71. In addition to this, there was due the $500' per month for office expenses from May 20, 1908, to the date of the completion of the contracts. The balance due on this debt at the date Dr. Pratt refused to make any further advances, August 29, 1908, was $1,497.94. We find it stated in defendant’s brief that the debt increased to $5,326.53 by the time of the completion of the contracts.
The testimony establishes that at the request and instance of Dr. Pratt the force of men on the work was constantly kept down to a minimum, in order to lessen the-amount of money that would have to be furnished to meet the pay rolls, and that *605 this was a much more expensive way of doing the work, and that owing to this, and to the repeated delays and hindrances, the expenses were' greatly increased. Dr. Pratt’s son, who represented him on the work, admits that he requested the company “to put as few men as possible on the work, because he did not have the money to pay the pay rolls for a large force.” Barangué, the inspector, says there should have been a force of at least 125 men, and that there never were more than 60. The subcontractor, Cook, testifies that he had figured on completing his work of subdrainage in 56 days, but that, owing to lack of money and materials, he was at it 116 days, from September 6, 1907, to January 31, 1908; that he had figured on 60 days for his work of repaving, and that, owing in the same causes, he had been at it 107 days, from March 28 to July 13, 1907. Barangué says it took 5 months to do work that should have been done in 60 days. Both of these witnesses say, and the McCoys testify to the same thing, that every delay and every interruption in the prosecution of a work of that kind means additional expenses. ■
Dr. Pratt admits that he had ample notice of the falling due of every account and note. He admits that he defaulted repeatedly to furnish the money when needed for the carrying out of the contracts.
“Q. Dr. Pratt, as a practical business man, don’t you know that if you had been enabled by the financial conditions at the time to have furnished the money for the material accounts promptly, to have paid the notes when due and the accounts when due, and the pay rolls when due— A. I never defaulted on a pay roll. Q. Well, we will leave out the pay rolls altogether — the accounts and notes when due, that the defendants would not have been hampered by lack of materials, and would have been able to have completed their contract with the city of New Orleans in a much quicker time than they did, to their advantage as well as your own? A. I believe so; yes.”
Capt. Hardee, the city engineer, testifies to the insufficiency of the force of men on the work, and to the suspensions and delaysuy reason of the lack of materials.
The subcontractor, Cook, testifies that, while his work on Magazine street was going on, the city undertook to lay a pipe along that street at the same time, thereby interrupting him in his work, and greatly inconveniencing him, and causing him considerable loss, and that he was for enjoining the city, but that Dr. Pratt urged him to submit, and not antagonize the city, as it would delay the issuance of the city certificates for the work, of which he, Dr. Pratt, stood in urgent need for. procuring money.
In like manner, and for the same reason of his urgent need of the certificates for procuring money, Dr. Pratt urged McCoy to-consent to receive less than was due him, as appears by the letter copied at page 1019-of this opinion.
The learned trial judge says:
“The record contains many begging letters from defendants to plaintiff for money for materials, pay rolls, etc., as if plaintiff was conferring favors, instead of being paid 50 peícent. of the profits for the money for these purposes.”
At other times the letters would be in the nature of demands and putting in default like that of May 1, 1908, copied at page 1019-of this opinion, and the following:
“Dr. Geo. K. Pratt, Pass Christian, Mississippi.
“Dear Sir: We wrote you on the 22d instant, and requested funds to pay for Sutton castings, which we need for the Magazine street repaving contract, and which he' refuses to furnish, owing to your defaults, and you have failed to send us the funds, notwithstanding your attorney, McConnell, informed us on the-12th of last month ’(the day he tried to inveigle us into signing two receipts which had for their objects to try and release -you from-your defaults and liabilities to us, in which attempt your attorney failed) and you had the-funds and were willing and ready to carry out your obligation with us, and which you have repeatedly failed to do since. You have failed and defaulted with your written agreement to pay Venable Brothers on the 15th of last month. You have defaulted on and allowed the Hiller Company note to go to protest on the 6th instant. You have defaulted to advance us-the moneys to pay Drs. Ford Brothers, and al *607 lowed us to be sued by them on the 6th instant. You have defaulted on the Menge & Son note and their open account, and allowed their claims to be collected through an attorney on the 17th of last month, which, through your defaults, has occasioned them to refuse to furnish any further material to us for these contracts we have on hand. You have defaulted with Sutton on a note on the 26th of last month. You have defaulted on the payment of freight bills on the small granite blocks on the 4th instant, which caused considerable delays. You have defaulted on pay rolls on the 9th instant, which facts regarding the protest and the freight bills, and also the pay rolls due, we notified you of on the 9th instant, and you replied thereto by your check on the 10th instant, notwithstanding that you had ample time given you beforehand. We have made repeated demands for the necessary moneys to carry on the Common street contract, which you have been deferring, and which you are in default on, and, as you will give us no satisfaction about, we hereby notify you and make this final demand. We demand the sum of $40, with which to provide and pay for the castings for the Magazine street repaving contract, as your agent has this day refused to pay any salaries accounts and office expenses, stating that he had no funds for salaries or office expenses. We demand the sum of $617, the approximate amount due. We demand immediately the sum of two hundred and eleven dollars ($211), with which to pay the note, past due, issued to William V. Seeber, city notary, for drawing up the contracts with the city, which stands unpaid on our books since last December, 1907. Your failure to comply and advance to us the above amount in full within the next five days from this date, July 24, 1908, we will consider and place you in default thereon without further notification. We do hereby notify you and' demand from you immediately the moneys necessary to carry on the Gommon street contracts (as per approximate estimates furnished you), amounting to $12,000. Your failure to comply to said demands made on you for the necessary moneys to carry on the Common street contracts, and to place said amount in bank for this Common street contract account, and to give us some satisfactory guaranty and assurance that the above amount will be forthcoming and advance to us in 12 weekly installments, with which to pay for material and labor to carry on the Common street contracts, with which we now call for and do demand from you, within five days from this date, July 24, 1908, we will consider and then place you in default thereon, without further notification.
“We request you to send us $150 to pay the William Demourelle note, which is due on the 27th instant. To-morrow being our supposed pay day, we request and call for the necessary moneys in full, which amount your agent has been notified of to pay all claims due 25th, and trust there will be no further postponement or defaulting thereon.
“Yours truly,
“Concrete Construction & Contracting Company,
“[Signed] John E. McCoy,
“Secty.-Treas.
“P. S. — Please note Addenda 3, relating to Cook matter.”
“Addenda,
“Beg further to inform you that Mr. Cook (subcontractor) has notified us to-day that they intend to hold us for the extra expenses caused him, waiting on us to furnish materials. He claims that he could have finished Magazine street repaving contract within 60 days from the starting of same, which was about April 1, 1908, had we not caused them repeated delays, and he claims (as was promised) that we should have had the materials on the ground, and it was only some few days ago. that we succeeded in getting for him the small granite blocks.
“We will have to adjust the matter satisfactorily with Mr. Cook on or before a final settlement, or he may cause us annoyance and prove a determent to the contract.”
[1] It was not alone in failing to furnish money for carrying out the contracts that Dr. Pratt defaulted in his contract. We consider that his intention to sell the certificates for the purpose of using the proceeds to reimburse himself his advances, instead of holding these proceeds for the purpose of carrying out the contracts, was an active violation of the contract. His intention so to do appears fully from his own testimony:
“I never contemplated,” he says, “when I got my hands on any of these certificates, putting them out for the completion of the Common street work. I contemplated my own reimbursement first of the money that I advanced as the contract called for. After the payment of the outstanding indebtedness for which I was responsible, I came in second before the completion of any other contract.”
Under the contract, Dr. Pratt had no right to use the proceeds of the certificates for his own reimbursement until after all the contracts had been completed. The provision of the contract on that point reads as follows:
“All certificates and the cash derived from the sale or collection of the same shall remain in the control of the said George K. Pratt until after the'completion and auditing of all of said contracts, to be used by him exclusively in *609 making payments or in securing funds for the carrying on of said contracts and the \v9rk upon the same, or as collateral in connection with the bond required by the city of New Orleans.”
.It is here seen that, until after the completion of all the contracts, the certificates and the moneys realized from the sale or pledge of them were to be used “exclusively” for carrying on the contracts. Nor is this all; hut other clauses of the contract show that it was the contemplation of the parties that, for the reimbursement of Dr. Pratt’s advances, the sale of the city certificates should be resorted to only after the property holders’ certificates had been exhausted. Thus in one place it is said:
“Reimbursement being first made of all amounts advanced, and, in so doing, the same shall be taken from the proceeds derived from the property holders’ portion of certificates when issued and collected, and the balance (if any) out of the city’s portion of said certificates.”
And again:
“The said George K. Pratt shall have the right, in his discretion, to pledge any and all certificates for advances necessary to carry out this agreement, and he shall further have the right to sell a sufficient amount of certificates, representing the city’s portion of payments under said contracts: Provided, that # sufficient funds are not derived from the collection of the property holders’ certificates for advances made by him.”
But it is said that the contract gave Dr. Pratt the right to sell the city certificates, and that this court so decided in the case of Concrete Construction & Contracting Co. v. Pratt, 125 La. 1046, 52 South. 153. We have just shown that the contract conferred no such right, and this court did not decide differently in the case just referred to.
That suit was an injunction to prevent the sale of the certificates. The injunction was sued out by McCoy the day before the expiration of the 60 days allowed him by Dr. Pratt for finding a purchaser for the $32,075.58 city certificate at a higher price than 80 cents on the dollar. The court dissolved the injunction, but for reasons which expressly excluded the present contention oí Dr. Pratt. Before the suit could be tried, all the six contracts had been completed, and nothing remained but for the parties to have their settlement and divide the profits; and the court held that, such being the case, there was then no longer any reason why Dr. Pratt should not have the right to sell the certificates. This was very far from holding that in June, 1908, before the contracts had been completed, and before any attempt had been made to collect the property holders’ certificates, Dr. Pratt had the right to sell the certificates for the purpose of reimbursing his advances. The court said:
“Admitting, tor the purpose of the argument, that plaintiffs were justified in retaining and refusing to give defendant the property holders’ certificates,” etc.
And again:
“Whatever may be the merits of the claims advanced by these plaintiffs in the other suits now pending [referring to the present suit], it is perfectly certain that their position in this case at this time is,” etc.
[2] The right thus claimed by Dr. Pratt to be reimbursed his advances before the sir city contracts had been completed was in violation, not only of the contract, but also of the terms of the letter of April 24th, transcribed at page 1019 of this opinion, wherein he had urged McCoy to consent to accept the certificates from the city, though less than was due him, in order that “we can make some satisfactory arrangement wherein we can pledge same.” This amounted to a promise that the certificates would be used only for carrying out the contracts.
[3] This threat to sell the certificates on a financial market so depressed as that of New Orleans was at that time was a serious matter to McCoy. It might mean the absorption of all his profits under the six city contracts, and, being unjustifiable, amounted *611 in reality to an active violation of the contract.
Another default of Dr. Pratt was in failing to collect the property holders’ certificates, which, as already stated, were practically in the nature of sight drafts by the city upon the property holders, and enforceable by lien upon their property in case of nonpayment. In that connection we quote from the learned trial judge’s opinion, as follows:
“Dr. Pratt failed to collect, up to August 13, 1908, and up to the time he testified, the property holders’ certificates on Magazine street, which he received July 27, 1908, as shown by his testimony:
“ ‘Q. Well, Dr. Pratt, between the time that you returned to the city from your stay over at Pass Christian and a month or six weeks ago, has any effort at all, to your knowledge, been made by you, or your counsel, or your agent, to collect these certificates against the property holders?
‘“A. No.’
“The evidence shows that the duplicates of these property holders’ certificates were not even delivered to the property holders:
“ ‘Q. Isn’t it a fact, Dr. Pratt — I don’t know whether you know it or not, but I will ask you the question — isn’t it a fact that the reason why you had trouble in the last six weeks or so, in the way of collecting these certificates, is that the duplicates have never been delivered to the property holders? Isn’t that the cause of the trouble?
“ ‘A. So I was informed by the bank a few days ago, and that is the reason why I asked you, a minute ago, if you had sent the duplicates. I did not recollect the duplicates, as I only got one package.’ ”
The trouble in connection with these property holders’ certificates seems to have been that Mr. McConnell, as Dr. Pratt’s attorney, wanted to charge a fee of 5 peícent. for collecting them, and that McCoy was not willing to pay this, but insisted that no lawyer’s services were needed for making the collection; that any bank would make the collection, and that for doing so 1 peí cent, or at most 2 per cent, would be ample compensation.
[4] Another feature of this case that has attracted our attention, as being in the nature of a violation of contract, is that Dr. Pratt, while thus delinquent in his obligation to furnish money, seems to have considered himself privileged, not only not to open the-letters addressed to him by his partner in. the business of these contracts, but not even to transmit them to Mr. McConnell, his, agent.
“I opened,” he says, “no mail whatever, and' I can assure you that, if it had the Concrete-Construction & Contracting Company on the back of the envelope, it was not opened at all.”'
This not opening of mail may perhaps be-justified on the score of illness; but his not transmitting the letters to his agent would be inexcusable. He also refused to receive- and listen to representatives of McCoy, who desired to lay before him the complaint of McCoy that Mr. McConnell was insisting: upon the right to charge a fee of 5 per cent, for collecting the property holders’ certificates.
Coming to the discussion of the case, the-first point to be considered is whether the contract was ever modified in respect to the obligation of McCoy to deliver the certificates into Dr. Pratt’s uncontrolled possession.
[5] The document, “McConnell X,” found, at page 1019 of this opinion, evidences such a modification; but its genuineness is questioned. In that connection we transcribe from the reasons of the judgment of the learned trial judge as follows:
“When shown ‘McConnell X,’ plaintiff denied ever having signed such a document, although he would not positively deny his signature. He admitted that it looked like his-signature, and that it was written on one of his prescription blanks. Plaintiff had evidently forgotten the entire circumstance. He testified that he had been a sick man, and his appearance on the witness stand verified his statement about the condition of his health. He answered, T cannot recollect,’ or its equivalent, some 30 or 35 times while on the witness-stand, March 8 and 9, 1909 (page 828 et seq.). On January 27, 1909 (page 752), he said: T was suffering (June 1 to October 15, 1908) from the result of ptomaine poisoning, and was exceedingly prostrated. I was not able to attend to business personally.’ March 10, 1909 *613 (page 1006), he said: ‘My health was very bad at the time that I can scarcely recall even the circumstances connected with the .delivery of the certificates.’ And on page 1054: T signed that letter in an offhand way. I signed a great many things that were presented to me in the same way, without any thought of their future use.’
“The document, ‘McConnell X,’ was lost or mislaid by defendants for a long time, and was only found and produced during the last days of the trial. Its authenticity is supported by the testimony of John A. McCoy, who wrote the document, one clause at the dictation of plaintiff, and saw and witnessed plaintiff sign it; by Joseph A. Cook, who was present and saw the document written by John A. McCoy and signed by plaintiff. (Mr. Cook’s testimony, August 22, 1910, p. 2 et seq.) Mr. Cook was an honest, worthy witness, who impressed the court very favorably. His testimony is entitled to the fullest consideration and weight. The authenticity is further supported by John F. McCoy, who read the document at the time it was executed, and by the testimony of G. Bonnafon, to whom it was shown on November 9, 1907, the day after it was executed. The authenticity is again supported by the entry of its execution made in the day book of defendant company November 8, 1907, and by the reference made to it by defendant McCoy in his monthly report for November, 1907, to the defendant company, found in the November minutes of defendant company; also, by the testimony of Mr. Ansley, August 23, 1910 (page 32), when he said that the defendant had told him of the execution of the document, of its loss, of his urging defendant McCoy to search for it, and of the failure to find it.
“The document, ‘McConnell X,’ confirms the interpretation of the agreement insisted upon by defendant in his written communications to plaintiff and his counsel, both before and after August 12, 1907, the date of the agreement, in his testimony as to verbal communications with them, both before and after the date of the agreement, and in his testimony before ‘McConnell X’ was found and introduced in evidence. It also confirms the repeated verbal agreement to make a trust agreement, testified to by witnesses on both sides.”
It is well to explain here that the letter referred to by Dr. Pratt, in his statement quoted above, “I signed that letter in an offhand way,” is not this document, “McConnell X,” but another letter.
The learned counsel for Dr. Pratt seek to discredit the witnesses here referred to by the trial judge. They call attention to a number of circumstances, which, they say, are calculated to throw suspicion upon the document One of these circumstances would have been very significant, in our opinion, if it had not been explained by the testimony of Mr. Ansley. It is that when McCoy was insisting upon a modification of the contract, at the time the first certificate was delivered, on and about the 27th of May, 1908, nothing was said about this document, “McConnell X.” Mr. Ansley says that his client had informed him of the existence of the document, but of its having been lost, and that, under the circumstances, it was deemed best not to refer to the document. This reason, he says, actuated him in not pleading this document in his answer; but that the search for the document was kept up, and that the paper was produced just as soon as it had been found. We are less inclined to doubt the genuineness of the document from the fact that this modification of the contract was certainly being insisted upon by McCoy at that time, and was one which a man who was so badly in default on his own part of the contract as Dr. Pratt was at that time would have been likely to concede readily, as it involved no sacrifice on his part; the sole object of the transfer being to afford security, and the proposed amendment affording complete security. Furthermore, we find that Dr. Pratt on two occasions between the date of the document, November 8, 1907, and the time when Mr. McConnell took charge for him, used expressions which would indicate that he understood the contract in the sense of this document. We refer to the letter of April 24, transcribed at page 1019 of this opinion, wherein he spoke of “we can pledge same to the bank as collateral,” and to the following letter:
“To the Concrete Construction & Contracting Company and John F. McCoy:
“Dear Sirs: You are hereby authorized by
me to negotiate with party or parties to sell city certificates for the Magazine and Gravier streets contracts, the proceeds and funds to be deposited for the joint account between us.
“Geo. K. Pratt, M. D.”
We are also much impressed by the fact that the parties had no difficulty in agreeing *615 to such an arrangement at the time of the transfer of the first certificate, and that the only matter which stood in the way was the insistence of Mr. McConnell to be the attorney to be employed in the matter.
.[6] Indeed, the contract itself was not in its terms limited strictly to a transfer to Dr. Pratt, but to him “or to such bank as he may select and designate as subrogee,” and McCoy testifies that he understood the clause as a whole to mean that Dr. Pratt would be obliged to designate such a bank if he (McCoy) required it; and upon the letters which passed between the parties at the time of the confection of the contract, and upon the testimony as a whole, the learned trial judge was of opinion that McCoy was entirely justified in putting 'that interpretation upon the contract. We do not concur in that view. We think that, in the case of a contract prepared with the openness and care and deliberation that attended the confection of this one, the parties must be held to have understood what is expressed in plain English in the instrument — whether as a matter of fact they did understand or not. But all this evidence, which so impressed the learned trial judge, does certainly lend color to the contention that, when asked to execute a writing adopting that interpretation as being the true intention of the parties, Dr. Pratt readily consented to do so by this document, “McConnell X.”
But if this document, “McConnell X,” were put aside, Dr. Pratt would be in no better position in this case. Mr. McConnell admits in his testimony that the trust agreement with the Citizens’ Bank would have gone through, if it had not been for the difficulty over the attorneyship for the collection of the property holders’ certificates, and he admits that in his conference with Mr. Ansley he “stated to him that he might go ahead with the transfer of the” $32,075.58 city “certificate, with the assurance that we [Dr. Pratt] would be willing to have a trust agreement made”; and Mr. Ansley testifies that it was distinctly understood that such' an agreement would be made, and McCoy testifies that he consented to transfer the certificate only because he had the assurance from Mr. Ansley that such an agreement had been made. Now, if it be conceded that this proposed agreement was never consummated, it, at any rate, went this far: That the parties fully agreed that Dr, Pratt would not in future insist upon the delivery .of the certificates to his uncontrolled possession, but would .agree to an arrangement for the deposit of them in trust. The contract was modified to that extent. Not only was this modification agreed to, but McCoy acted upon it, and Dr. Pratt' profited by it, in that he thereby obtained from McCoy the delivery of the certificates.
[7] If the concession were made, however, that neither on November 8, 1907, by the document, “McConnell X,” nor at the time of the delivery of the $32,075,58 city certificate in the latter part of May, 1908, the contract was modified — in other words, if it be conceded that the contract was never modified — still Dr. Pratt is in no position to demand specific performance. His repeated defaults stand in the way. A party seeking to compel the specific performance of a contract must himself show a specific compliance with his own obligation. Satterfield v. Keller, 14 La. Ann. 606.
“Plaintiffs themselves in default, are in no position to put defendants in default.” Sitman v. Lindsey, 123 La. 53, 48 South. 646.
But it is contended that at the time of the payment to him of the $4,284.08 on June 12, 1908, McCoy consented to waive the defaults of Dr. Pratt up to that time, and that none occurred thereafter.
We have found that McCoy not only did not so consent, but that he expressly and positively refused to do so, and announced his intention to hold Dr. Pratt to all the legal consequences of these defaults. And *617 we have found, also, that Dr. Pratt defaulted repeatedly and grossly thereafter. We have not taken the time and trouble to detail all these defaults. They are set forth in extenso in defendant’s brief, with verification by proper references to the record.
[8] If it were admitted, however, that Dr. Pratt, or Mr. McConnell for him, had never consented to a modification of the contract, we do not think he would be in any better position for maintaining his present action for specific performance. Specific performance has never been favored in our law. This is evidenced by a long line of decisions. City v. Railroad Co., 44 La. Ann. 64, 10 South. 401; Solomon v. Diefenthal, 46 La. Ann. 903, 15 South. 183; Rice v. Rice, 46 La. Ann. 712, 15 South. 538; Mirandona v. Burg, 49 La. Ann. 657, 21 South. 723; Laroussini v. Werlein, 48 La. Ann. 13, 18 South. 704; Caperton v. Forrey, 49 La. Ann. 872, 21 South. 600; Citizens' Bank v. James, 26 La. Ann. 267. In the first of these cases, the court went so far as to announce broadly that:
“It is only when no adequate compensation can be made in damages that courts of this state can decree a specific performance of a contract. That decree cannot be demanded as a matter of right.”
True, in Girault v. Feucht, 117 La. 276, 41 South. 572, the court qualified that announcement. Still the extreme reluctance of our courts to enforce specific performance remains in full force. Code Napoleon, art. 1142, provides that:
“Every obligation to do or not to do resolves itself into a claim for damages in case of in-execution on the part of the debtor.”
[9] At common law specific performance is purely an equitable remedy; the sole remedy at law being damages. A. & B. B. of L., vol. 26, p. 15. And where specific performance is demanded, the rule that “he who seeks equity must do equity” comes into full play. Id. 43. [10] In other words, the granting of this relief is a matter largely within the discretion of the court (Id. 62), if not entirely so (Pope Mfg. Co. v. Gormully, 144 U. S. 224, 12 Sup. Ct. 632, 36 L. Ed. 414).
[11] Now, at the time that Dr. Pratt filed this suit, he could have had, without suit, the full measure of his substantial rights; that is to say, he could have had full reimbursement of his advances just as soon as the contracts were completed, and could have had, in the meantime, full and complete security for these advances by the deposit of the certificates in bank to his order, as McCoy proposed to do, and had in fact already done, when this suit was instituted. Under these circumstances, we do not think that a party so grossly in default on his own part of the contract as Dr. Pratt was could with any show of justice or equity demand and exact that the other party, who had been in no way delinquent or remiss in discharge of his obligations under the contract, should be made to conform to the very letter of the-contract, especially in a matter not involving the substance of the contract, but merely an incident as it were.
[12] The defaults of Dr. Pratt are sought to be excused on the-plea that his inability to procure money was due entirely to the stringency of the money market; a panic being on at that time. This is not so clear, for we find that he sought to borrow money on the $6,000 note of McCoy’s company, although he knew this company to be practically a mere paper corporation with no capital; and we find that there was no great difficulty in obtaining money on the pledge of the $32,075.58 city certificate. But, even if it had been otherwise, the stringency of the money market would be no legal excuse to him for not fulfilling-his obligation to furnish money. The future condition of the money market was one of the things, if not the main thing, to be taken into consideration by him when under *619 taking to finance the contracts. He does not show that it was impossible to get money on proper collaterals; and the fact that performance of the contract became more difficult or burdensome is no excuse for nonperformance. 9 Cyc. 625-629. The difficulty of procuring money was one of the things McCoy was guarding against in entering into the contract, and for which he was giving Dr. Pratt one-half of the profits.
[13] But it is contended that McCoy’s continuing to receive money from Dr. Pratt necessarily operated a condonation of all past defaults; that he had to choose between putting an end to the contract, or allow it to go on, and that, in the event of his choosing the latter, the contract continued in force as made, unmodified, and he continued to be bound by all the clauses in it, not excepting this clause to transfer the contracts and certificates to Dr. Pratt; that he could not demand of Dr. Pratt compliance with the latter’s obligation to finance the contracts, and not be willing on his own part to comply with his part of the contract.
That argument is unanswerable in abstract logic, and is to a large extent sound also in law. McCord v. W. Feliciana R. R., 8 La. Ann. 285. But circumstances alter cases, and the law of contract is essentially a matter of equity.
If applied with the inflexible rigidity with which the learned counsel for Dr. Pratt would apply it in this case, that argument, sound as it may appear, would be found to be in opposition to the whole doctrine of substantial performance, a doctrine as fully and solidly established as any other part of the law of contracts.
We do not know but that under this doctrine of substantial performance it might be argued that the substantial part of McCoy’s contract, the quid pro quo on his part, that which counterbalanced or served as the consideration for the making of the advances by Dr. Pratt, was, as expressed in the contract, his “time and efforts, as general manager, being given to the carrying on of the aforesaid contracts” with the city of New Orleans, and that this matter of the delivery of the certificates to Dr. Pratt was a mere incident, the omission of which would not have prevented the object and purpose of the contract, namely, the making of profits by entering into and carrying out the contracts with the city, from being fully and completely realized, and that, therefore, McCoy’s refusal to make such delivery could be considered to be not such a violation of his contract as would preclude him from exacting substantial performance from Dr. Pratt. By this we do not mean that McCoy could retain the certificates in his own possession, and thus deprive Dr. Pratt of the security which he was entitled to for his advances. As a matter of course, Dr. Pratt was entitled to have the certificates delivered, as provided in the contract, either to himself or to some bank of his choice as subrogee; but this delivery to some bank as subrogee would afford all the security contemplated by the original agreement of the parties (the agreement which Mr. McConnell was to put in writing and in proper form without any additions of his own). It would furnish all the security necessary, and would be a substantial performance on the part of McCoy — as close a performance as a party so grossly in default on his part as was Dr. Pratt could reasonably or equitably demand.
[14] Be that, however, as it may, we mention it only in passing; but we do say that, while it may be entirely true in the case of an ordinary contract, wherein only the parties themselves are concerned, which they are in a position to terminate if they so desire, that the parties must elect between affirming and standing upon the contract, or else putting it aside altogether and letting *621 their relations be governed by general principles of equity, the same thing is not true ■of a contract by which two parties undertake to do together, for a third person, ■something which it was never intended that -either should do alone, or which, possibly, neither is able to do alone. In such a case, no matter how much the parties may disagree as between themselves, they are bound to remain together until the completion of their undertaking. In such a case the two have set out together in one boat, and must continue together to their destination, no •matter how much they may quarrel. Neither is at liberty to throw the other overboard.
While these contracts with the city were taken in the name of McCoy’s company, they were as much for the benefit of Dr. Pratt as •of McCoy. As between Dr. Pratt and McCoy, they were to be as much Dr. Pratt’s contracts as McCoy’s. Each was to have an •equal interest in them and an equal right to have them carried out and to share in the profits to be thereby realized. From the fact that the contracts were to be taken in the name of McCoy’s company, it does not follow that they were to belong to McCoy, and that Dr. Pratt was not to have an equal interest, ■or was not, so to speak, to be an equal partner, in them. As between Dr. Pratt and the ■city, Dr. Pratt was not a party in interest; but as between him and McCoy he was. Indeed if it were true, as now contended by Dr. Pratt, that the contracts themselves, and not merely the certificates, were to be transferred to him, he was to be a party to these -contracts, not only as between him and McCoy, but as between him and the city. He and McCoy were to change places. He was bo take McCoy’s company’s place as contractor with the city, and McCoy was to take his place in simply having an interest of one-half in the profits to be realized. McCoy had, therefore, no right to put an end to the contract in the sense of not allowing Dr. Pratt- to go on furnishing the money to carrying out the city contracts, with the right to share equally in the profits. In the same way that Dr. Pratt could not at any time have said to McCoy, I am not satisfied with the manner in which you are giving your “time and efforts, as general manager, to the carrying on of the contracts,” and therefore I put you in default under our contract, and put an end to our contract, and will, from now on, carry out the contracts with the city alone and take all the profits; so McCoy could not at any time have said that same thing to Dr. Pratt. The argument that McCoy, if he desired to hold Dr. Pratt to his defaults, should have refrained from demanding, or receiving, any further moneys from him, presupposes that it was possible for him to do so under the circumstances; whereas, such a thing was not possible. He had no better right to throw Dr. Pratt overboard than Dr. Pratt would have had to throw him overboard, if the contracts had been transferred to him; and all he could do was to say, as he, in effect, did say, to Dr. Pratt: You have defaulted on your part of the contract, and I hold you to all the legal consequences of the default. One of these consequences is that, being in default, you are no longer in a position to demand, or expect, specific performance on my part, or, in other words, to insist upon the very letter of the contract being conformed to by me. We are equally interested in these contracts. We are in the same boat, and must go on to the end as best we can, and therefore each of us must go on and perform substantially his part. The situation was not different, legally, as between Pratt and McCoy, from it would have been if the two had been joint contractors with the city of New Orleans, but with the understanding as between themselves that the one should see to the finances and not be responsible for losses, and that the other should furnish his personal services *623 and run all risk of loss. In such a case, it would be plain that neither party could put aside the other because of the other’s defaults or supposed defaults, and insist upon carrying out alone the contracts with the city and taking all the profits, but that all that either party could do would be to go on and carry out the contracts with the city and allow the defaulting party to do the same, while holding him to the legal consequences of his defaults. In such a case, the contract continues in force only in so far as the exigencies of the situation require: To use the expression of the Supreme Court of the United States in Dermott v. Jones, 2 Wall. 1, 17 L. Ed. 762-764:
“The contract will be applied as far as it can be traced.”
The same legal difficulty in defining the respective rights of the parties which is here presented occurs in every case of defective performance of a contract, where the circumstances are such that the obligee in the contract has no choice, but finds himself compelled to abide by, and accept, the performance, defective and unsatisfactory as it may be. An example of such a case is Levy v. Schwartz, 34 La. Ann. 209-214. It was there contended that, by taking possession of a defective cotton press and using it, the plaintiff hád waived or condoned the defaults of the defendant. The court held not. See numerous cases cited both in the opinion and in the brief of counsel in that case, and especially Conery v. Noyes, 17 La. Ann. 203, and Nicholson v. Desobry, 14 La. Ann. 81. In Ramsey v. Tully, 12 Ill. App. 463, the court reasoned as follows:
“A voluntary acceptance without objection of a purchased article, where there are no compulsory circumstances necessitating such acceptance, and no special damages to be occasioned thereby, may properly be regarded as evincing an intention to waive the time specified for delivery. But where the circumstances are such as to show that the acceptance can in no just sense be regarded as voluntary, but rather as compulsory, the presumption of an intention to waive does not arise. Appellants were engaged in the construction of a public work, for the completion of which they had given bond. The work was but half finished, and they could obtain brick of the requisite quality nowhere but from appellees. They notified them of their necessities, and requested them to comply with their contract. To say that the acceptance after the time for delivery had passed under such circumstances was voluntary, in such sense as to evince an intention to waive their right to claim damages for the delay, would be a perversion of language. They did the best they could in the situation in which they found themselves placed.”
In Ketchum v. Wells, 19 Wis. 34, the court said:
“They could not, therefore, without great injury, return the bolts; and the fact that they did not, but kept and used them, ought not to be deemed a waiver of the right to object that the bolts were not such as the contract called for. This position is sustained by many well-adjudicated cases, and we cannot see that it violates any sound, just principle or rule of law.”
In Cox v. Long, 69 N. C. 7, the defendants contracted to deliver to the plaintiff 60,000 cypress shingles 4 inches wide and 20 inches long. The shingles were paid for, shipped, and hauled to the plaintiff’s building, when it was found that they only measured 3 inches in width and 17 inches in length. The evidence showed that the shingles were received too late for the plaintiff to secure others in their stead without immense damage to the building then being erected by them, and they actually used the shingles, or a part of them, for the protection and completion of the building. The defendant contended that, by receiving the shingles and using them, the plaintiff waived any want of conformity to the contract and right of action they might have had for breach of contract. The court held that, by receiving and using the shingles, the plaintiff had not waived his right to maintain an action for breach of contract, and had not waived want of conformity to the contract.
Citations to the same effect might be multiplied. The law on that point seems to be | well settled. By continuing with the eon- *625 tract, therefore, McCoy did not waive Dr. Pratt’s defaults, and did not restore Dr. Pratt to the position of a party who, having performed in full his part of the contract, is entitled to demand like performance of the other party. McCoy continued to hold Dr. Pratt to all the legal consequences of his defaults, and one of those consequences is that Dr. Pratt, being in default, is in no position to demand specific performance.
It is also contended for Dr. Pratt that McCoy was the first to default, in that he did not transfer the city contracts to Dr. Pratt, although the contract required that he should do so as' soon as the contracts should have been entered into.
This idea of transferring the contracts themselves to Dr. Pratt formed no part of the original agreement between McCoy and Dr. Pratt, which Mr. McConnell was called upon to reduce to writing and put in proper form. Mr. McConnell testifies that it originated with him; he thinking to increase thereby Dr. Pratt’s security for his advances. Such a transfer was altogether impractical, and, doubtless, Dr. Pratt would, originally have been as much adverse to it as McCoy, since it would have made him the contractor with the city, with all the incidental obligations and responsibilities— a thing which the record does not show he in the least contemplated.
The contracts were not transferable, except by and with the consent of the city council; and hence the matter of their transfer was not entirely within the control of the contractor. Absolutely nothing was said about the transfer of these contracts until August 10, 1908, one year, less 12 days, after the notarial acts evidencing the first two of them had been signed, and only after three of them had been completed and one other practically completed, and only on the eve of the filing of the present 'suit; that is to say, after the parties had come, as it were, to a parting of the ways. Mr. McConnell and Dr. Pratt seek to explain this silence by saying that McCoy had promised to transfer the contracts, and that they supposed he had done so. This may explain the silence up to a certain time, up to the time in the latter part of May, 1908, when the first certificates were about to be issued; but at that time Mr. McConnell and Dr. Pratt were aware, as they admit, that the transfer .had not been made, and yet they said not a word about the matter, although they were insistent upon the transfer of the certificates, and said not a word about the matter thereafter until, as we have just observed, the parties had come to the parting of their ways, on the eve of the filing the present suit, August 10, 1908. McCoy testifies that it was never the intention that the contracts themselves should be transferred, and that he never understood the contract as so requiring; and there is a good deal to be said in support of that ■ interpretation. The same clause which provides that the contracts shall be transferred .also provides that McCoy shall transfer the certificates — a manifest self-contradiction, since, if McCoy transferred the contracts, the certificates would be issued directly to Dr. Pratt, and McCoy would have no certificates, to transfer. It is not and could not be contended that the certificates could have been transferred by anticipation, as such a thing was not possible; it being forbidden by law. A similar clause for the transfer of the contracts was inserted in the trust agreement which it was proposed that the bank should execute; and certainly it could never have been contemplated that these banks should have these contracts transferred to them, and they thereby be made qontractors with the city of New Orleans for this street paving and sew’erage work.
[15] As a concluding remark in connection with the nontransfer of these contracts, we *627 will say that, while a contractee does not lose the benefit of the clause in his contract simply because he does not insist upon compliance with it, or is tardy in doing so, yet he cannot charge his contractor with default ■simply because the latter had failed to do ■something which apparently nobody desired ■should be done.
[16] In view of the apparent change in the financial standing of Dr. Pratt, and in view ■of his claiming the right to be reimbursed his advance out of the certificates before the six contracts with the city had been completed, equity would not have required McCoy to deliver these certificates to his uncontrolled possession, especially considering the strained relations that had grown up between the parties, and the attitude of Dr. Pratt of his being under no obligation to confer with his business associate or his representatives, and, if the certificates were delivered to him, his not caring a “damn” what his lawyers would charge for collecting them. That specific performance will not be enforced at common law, where a change has come about in the circumstances under which the contract was entered into, see Cent. Dig. “Specific Performance,” vol. •44, p. 1254.
In the mind of McCoy, the financial standing of Dr. Pratt had changed considerably between the time of entering into the contract and the time when the first certificate was ready to be issued by the city and demand was made that it be delivered to Dr. Pratt. At the signature of the contract, McCoy supposed Dr. Pratt to be a man of large means, to whom the amount involved in these contracts was a matter of no very .great consequence; whereas, by the time the certificate was ready to be issued, McCoy had found him to be unable to command ■even minor sums of ready money, and had ascertained that practically all his property had been transferred to a corporation.
A great change had also come about in the personal relation of the parties. They had had a falling out. Another change that had come about, and one fraught with great danger to McCoy, was in Pratt’s attitude towards what disposition he should be entitled to make, and intended to make, of the certificates, if delivered to him. By the contract he was expressly bound to retain the certificates, or their proceeds, “until after the completion and auditing of all of said contracts, to be used by him exclusively in making payments or in securing funds for the carrying out of said contracts” ; whereas, by the time the first certificates were ready to be issued by the city, he had come to believe that the reimbursement of his advances came first on the certificates, or their proceeds, and the completion of the contracts was subsidiary. See his express statement to that effect, page 1022 of this opinion.
As the result of these changes, the clause for the delivery of the certificates to Dr. Pratt, which at the entering into the contract McCoy could have no objection to, as no harm or inconvenience could come to him from it, had become a very irksome and burdensome one to him, possibly fraught with danger to his interest in the certificates.
The learned counsel for Dr. Pratt lay great stress on the fact that he advanced some $80,000 towards the execution of the contracts, as if all the equities of the case were thereby carried to Dr. Pratt’s side, or as if the necessity of delivering the certificates followed from it in natural sequence. But, in the first place, the estimated amount which the execution of the contracts called for was $124,000; and, in the next place, we find that out of this $80,000, or, to be exact, $79,391.17, some deductions are to be made —‘for instance, the $18,500 borrowed from the Hibernia Bank on the pledge of the $32,075.58 city certificate. And if the $124,- *629 •000 had been advanced, it does not follow that Dr. Pratt was entitled to anything more than to be reimbursed his advances after the ■contracts had been completed, and even then not out of the city certificates until the property holders’ certificates had been exhausted. The amount due him after deduction of the $18,500 and other minor amounts, and after exhaustion of the property holders’ ■certificates, would not have been large, and, had he consented to the deposit of the certificates in bank to joint account, could have been easily covered by a loan or pledge of •the city certificates. Dr. Pratt was entitled to nothing more than reimbursement and security, and the deposit of the certificates to joint account would have afforded him the •absolute certainty of both.
It results from the foregoing that specific performance should not be ordered, and that the sequestration and injunction were unjustified, and that they must be set aside.
We agree with the learned trial judge that the ends of justice will be best subserved by the reconventional demand of the defendant being sustained, and the settlement of the parties being required to be had in the present suit. The judgment appealed from, however, does not make plain whether this settlement is to include, or not, any claims for damages McCoy may have against Dr. Pratt. We will therefore add that it is our ■understanding that such claims are not to be included, they having been expressly reserved in the reconventional demand, and being, as we understand, pending in another suit, but that the settlement is to consist simply in the casting of the accounts by an accountant on the face of the papers — such a settlement as that provided for by the •contract, such as would have taken place if the parties had carried out their contract to their mutual satisfaction and continued friendly — only that it is to be made in court, and subject to decision by the court •of any differences that may arise.
Another point which the said judgment does not make plain, and as to which, we think, a word should be added, is that the sheriff is to restore the certificates and what money remains sequestered in his hands to the custody whence he took them — that is to say, to the Hibernia Bank & Trust Company — and not deliver same to the defendants ; and in view of the possible refusal on the part of the Hibernia Bank & Trust Company to receive the certificates on the same terms heretofore agreed on, it might be well to add that in that event the trial court should make some order looking to the deposit of said certificates by the sheriff in some bank of Dr. Pratt’s selection to the joint account of the parties, subject to the terms of the contract of the parties.
[17] We will add, further, that it is our understanding of the said judgment that it recognizes, as certainly our own does, the right of Dr. Pratt to have the certificates deposited at once in a bank of his selection for the joint account of himself and the defendants, subject to the terms of his contract with them, and that therefore it is his right to have the certificates not yet issued by the city judicially sequestered pending settlement, unless Mr. McCoy so deposits them at once as soon as issued.
We will add, further, that, in the event of Dr. Pratt’s refusing to make the selection of a bank, then that said certificates should be ordered to be deposited in court, or, in other words, be placed in the judicial depository.
For convenience in recasting, we set aside the judgment appealed from.
It is ordered, adjudged, and decreed that the judgment appealed from be set aside, and that there now be judgment dismissing plaintiff’s suit, and dissolving the writs of sequestration and injunction therein issued.
It is further ordered, adjudged, and decreed that the sheriff restore to the Hiber *631 nía Bank & Trust Company the certificates and cash now sequestered in his hands, if that institution will receive same on the same terms and conditions on which it held same at the time of the sequestration; and, in the event said institution will not so receive said property, then that the sheriff deposit same in some bank of Dr. George Iv. Pratt’s selection, subject to the terms of the contract between him and John E. McCoy and the Concrete Construction & Contracting Company, of date June 12, 1907; and, in the event Dr. George K. Pratt will not make the selection of a bank for such deposit when called upon so to do by the sheriff, then that the sheriff at once place said property in the judicial depository, subject to the further orders of the court.
It is further ordered, adjudged, and decreed ’ that Alexander Allison be and is hereby appointed auditor, to audit the accounts of the parties to this suit, and that a commission issue to him to that effect; that the parties to this suit submit such books and accounts as they may desire to said auditor within five days from the date of the registry of the present judgment in the lower court; and that said auditor report to the court within five days thereafter, or within ten days from the date of the registry of the present judgment in the trial court, upon such accounts as may have been submitted to him by said parties.
It is further ordered, adjudged, and decreed that the plaintiff, Dr. George K. Pratt, pay the costs incurred in the trial court to this date and the costs of this appeal.
It is further ordered, adjudged, and decreed that the right be reserved to Dr. George K. Pratt to ask for the immediate judicial sequestration of the certificates not yet issued by the city, in the event John F. McCoy does not offer to deposit them at once, as soon .as issued, in whatever bank Dr. George K. Pratt may designate for that purpose, to their joint account, subject to the terms of the contract, and does not at once so deposit said certificates.