McCauley v. Arkansas Rice Growers' Cooperative
Association.

Opinion delivered October 11, 1926.

1. Agriculture—construction of cooperative marketing con-
tract.—In construing the contract of a cooperative marketing
association, organized under the Cooperative Marketing Act
(Acts 1921, p. 153), the existing conditions and the situations of
the producers must be considered, in order to ascertain the inten-
tion of the parties from the language used in the contract.

2. Agriculture — breach of contract — enforcement.—Where
plaintiffs, members of a cooperative marketing association, entered
into a contract with the association for the marketing of their
rice, a breach by the association of independent covenants in such
contract did not absolve such members from performance of their
contract, since otherwise the usefulness of the association would
be impaired if not defeated.

3. Agriculture—cooperative marketing contract—reserve fund.
—Where, under a cooperative marketing contract, a reserve of
2 per cent. was to be deducted from the value of the rice marketed
"for credits and general purposes," the association may retain
the unexpended balance as a continuous surplus or reserve fund
to be used in case of need.

4. Agriculture—method of pooling rice.—Where a marketing
association's agreement with its members provides that the asso-
ciation shall pool or mingle the rice of its members, and that it
may sell same in the rough or otherwise, and to the trade or to
the public, it may pool and sell the rice either in the rough or in
the clean.

5. Agriculture—authority of cooperative marketing associa-
tion.—Where an association was organized merely to sell the rice
of its members, it was not authorized to buy rice, whether mort-
gaged or not.

6. Agriculture—cooperative marketing association—mortgages.
—A cooperative marketing association may pay off a mortgage
upon a member's crop when, in good faith, it believes the value
of the rice to exceed the mortgage, in which case, if the rice sells
for less than the amount of the mortgage, the loss must be borne
by the mortgagor.

7. Agriculture—cooperative contract—advances.—Under a co-
operative marketing contract, the association, in making advances
to its members, should do so in uniform percentage; otherwise
the member receiving an advance should pay interest thereon.

8. Receivers—appointment to take charge of corporation.—
Courts proceed with great caution in the appointment of receivers

to take charge of the affairs of a corporation, as such action amounts to displacement of the directors.

9. RECEIVERS—OTHER ADEQUATE REMEDY.—Receivers are not appointed when the acts complained of may be remedied by injunction or other available means.

10. AGRICULTURE—MARKETING CONTRACT—DISTRIBUTION OF PROFITS.— Profits made by a marketing association during the year through unauthorized dealings with nonmembers are to be distributed at the end of the year, since no accumulation of a surplus fund therefrom was contemplated by the contract of association.

11. COSTS—ALLOWANCE IN EQUITY.—The granting of costs in equity is within the court's discretion, and the principle which should guide that discretion is that the party who, by his fault, has unnecessarily involved another in litigation, should pay the costs.

12. COSTS—ALLOWANCE—DISCRETION.—Where the trial court found that defendant marketing association breached its contract with plaintiffs in several important respects, though the particular relief sought was denied, it was not an abuse of discretion to charge defendant with the costs in that court.

13. COSTS—ALLOWANCE ON APPEAL.—Though the chancellor's decree in part was reversed, yet, where such ruling inured to the benefit of the appellee, costs will be awarded against the appellants.

Appeal from Lonoke Chancery Court; *John E. Martineau*, Chancellor; reversed in part.

STATEMENT BY THE COURT.

Lee McCauley and others brought this suit in equity against the Arkansas Rice Growers' Cooperative Association.

The defendant is a corporation organized under the act of February 14, 1921, which expressly provides that the act should be referred to as the Cooperative Marketing Act, and the plaintiffs are members of that corporation.

The suit was originally brought by Lee McCauley for himself and for other members. From time to time other members joined in the suit until there were 118 members joined as plaintiffs; and it may be stated here that this number constituted but a small part of the membership.

The defendant commenced to operate under the act in the fall of 1921, and since that time it has handled the

rice grown by the plaintiffs and the other members of the corporation.   What was termed a "marketing agreement" was entered into between the defendant and each member of the corporation, including the plaintiffs in this action.

That part of the "marketing agreement" which is material to a decision of the issues raised by the appeal reads as follows:

"5.   The association shall pool or mingle the rice of the growers with rice of a like variety, grade and quality delivered by other growers.   The association shall grade all the rice, and its grading or classification shall be conclusive.   Each pool shall be for a full season.

"6.   The association agrees to resell such rice, together with rice of like variety, grade and quality, delivered by other growers under similar contracts, at the best prices obtainable by it under market conditions, and to pay over the net amount received therefrom (less freight, insurance and interest) as payment in full to the grower and growers named in contracts similar hereto, according to the rice delivered by each of them, after deducting therefrom, within the discretion of the association, the costs of maintaining the association, and costs of handling, cleaning, grading, processing and marketing such rice; and of reserves for credits and other general purposes, said reserves not to exceed two per cent. of the gross resale price.   The annual surplus from such deductions must be prorated among the growers delivering rice in that year on the basis of deliveries.

"7.   The grower agrees that the association may handle, in its discretion, some of the rice in one way and some in another; may sell some in the rough or otherwise; may contract for or effect the milling of all or any thereof and sell the finished product to the trade or otherwise; may adopt such marketing, advertising, merchandising methods as it may deem advantageous; but the net proceeds of all rice of like quality and grade, less charges, costs and advances, shall be divided ratably among the growers in proportion to their deliveries to each pool,

payments to be made from time to time until all the amounts of each pool are settled.

"8. The association may sell the said rice within or without this State, directly to millers or brokers, or the trade or the public, or otherwise, at such times and in such conditions and terms as it may deem profitable, fair and advantageous to the grower, and it may sell all or any part of the rice to or through any agency, now established or to be established hereafter, for the cooperative marketing of the rice of the growers in other States throughout the United States, under such conditions as will serve the joint interest of the growers and the public; and any proportionate expenses connected therewith shall be deemed marketing costs under paragraph 6.

"9. The grower agrees that the association shall borrow money in its name on the rice, by the issuance of commodity bonds or bearer certificates, or through drafts, acceptances, notes or otherwise, or on any warehouse receipt or bills of lading, or upon any accounts for the sale of rice, or on any commercial paper delivered therefor. The association shall prorate the money so received among the growers equitably, as it may determine, for each district and period of delivery.

"The association agrees to accept drafts drawn against it by the grower for any amount specified and determined by it, upon delivery of rice hereunder, and to assist the grower to discount such drafts, secured by the warehouse receipts, through the most advantageous banking system.

"10. The association may establish selling office, warehouses, plants, marketing, statistical or other agencies in any place.

"11. The grower shall have the right to stop growing rice and to grow anything else at any time at his free discretion; but, if he produce any rice under the terms hereof, it shall be included under the terms of this agreement, and must be sold only to the association,

"12. Nothing in this agreement shall be interpreted as compelling the grower to deliver any specified quantity of rice per year; but he shall deliver all the rice produced or acquired by or for him as landlord or lessor.

"13. (a) This agreement shall be binding upon the grower as long as he produces rice directly or indirectly, or has the legal right to exercise control of any commercial rice or any interest therein, during the term of this contract.

"(b) If this agreement is signed by the members of a copartnership, it shall apply to them and each of them individually, in the event of the dissolution or termination of the said copartnership.

"(c) If the grower places a crop mortgage upon any of his crops during the term hereof, the association shall have the right to take delivery of his rice and to pay off all or part of the crop mortgage for the account of the grower and to charge the same against him individually.

"The grower may place a crop mortgage upon his rice, and agrees to notify the association prior to making any crop mortgage; and the association will advise the grower in any such transaction."

Section 17 of the Cooperative Marketing Act provides that the association and its members may execute marketing contracts requiring the members to sell, for any period of time not over ten years, all or any specified part of their agricultural products or specified commodities, exclusively to or through the association or any facilities to be created by the association. Under the section, the contracts may provide that the association may sell the products of its members, with or without taking the title thereto, and pay over to its members the resale price, after deducting all necessary selling, overhead and other costs and expenses.

The section also provides that the marketing contract may fix, as liquidated damages, specified sums to be

paid by the member to the association, upon the breach by him of the marketing contract.

It further provides that the association shall be entitled to an injunction to prevent further breach of the contract and to a decree for specific performance thereof. The contract follows the powers conferred by the act authorizing the incorporation of the association. Gen. Acts of 1921, page 153.

Pursuant to the terms of the act, the marketing contract provides the sum of one cent per pound for rough rice, as liquidated damages for a breach of the contract by the members. The contract also provides that the association shall be entitled to an injunction to prevent a further breach of the contract and to a decree for specific performance thereof.

It is conceded by counsel on both sides that the findings of fact made by the chancellor in this case are sustained by the evidence. Therefore, for a statement of the facts and questions involved in this appeal, we quote from the decree:

"The court makes the following findings as to the material issues in this case:

"First: That the method of pooling rice in the clean, adopted by the association, was a proper and permissible method of pooling, and also that the association had the right to consent to the sale of mortgaged rice of certain of its members, in the rough, in the seasons of 1921-22 and 1922-23, and accept a commission of 10 cents per barrel for such services as it rendered these members.

"Second: That the $54,872.69 which was deducted by the association from the first year's expenses of milling and storing rice was wrongfully deducted and spread over the five-year period, and should be charged to and paid entirely by the members of the association for the season of 1921-22.

"Third: That the reserve of 2 per cent. deducted each year for credits and general purposes can be used to pay only contingent expenses of the crop for which

it is collected, and must, after the contingent expenses of that season are paid, be returned to the members who paid it, in proportion as they paid it.   The unexpended balance of this reserve cannot be returned to the members until the season's business has been entirely disposed of.   Any unexpended part of this reserve then belongs to the particular members who contributed it, and not to the association generally.

"Fourth: That the association cannot purchase rice at all, whether mortgaged or not, and the purchase of mortgaged rice in 1923-24 was a violation of its contract with its members.   The association has a right to pay off a mortgage when it honestly believes the value of the rice exceeds the mortgage, and to take the mortgaged rice upon the same terms and conditions that it takes rice of other members, but if the value of such mortgaged rice, when sold, is less than the mortgage, the difference must be borne by the grower of the rice, and likewise, if its value exceeds the mortgage, such excess goes to the grower.

"Fifth: That the method adopted by the association in making advances is incorrect.   The same percentage should be advanced to all members at the same time, or, if this is not done, members to whom advances are made should pay interest on the amount of the advances received.

"Sixth: The issues raised with reference to the salaries paid the officers, the stolen rice, the cost of milling rice, the payment of attorneys' fees and the selection of directors, are material only to show such gross inefficiency or mismanagement of affairs of the association on the part of its officers as would justify the appointment of a receiver.   The court is of the opinion that the facts proved as to these issues do not establish a right to a receiver.   The amount of salaries paid officers and employees is entirely within the discretion of the board of directors.   The facts established in connection with the stolen rice do not justify the court in finding that the officers were in any way connected therewith.   The

cost of milling rice is not shown to be excessive, under the conditions. The cost of milling rice would perhaps never be the same in different mills nor the same in the same mill under different managements. The manner in which the directors of the association were elected was in accordance with the by-laws and articles of incorporation of the association. The court is also of the opinion that the association had a right to aid the 'buyers' association' in the manner in which it did, and that the contract with the Connell Rice Company was one which the association could properly make.

"The court finds that the violations of the contract herein found to exist are due to a mistaken or wrongful construction of such contract on the part of the officers and directors of the association, and that any wrong done can be corrected by a restatement of the accounts of the members and that such violations do not relieve the members from a further compliance with their contract to deliver their rice to the association, nor do they justify the appointment of a receiver. However, unless the two auditors employed by plaintiffs and defendants, respectively, can agree upon a restatement of the accounts of all the members of the association for the season of 1921-22 and upon a distribution of the unexpended annual reserves up to this date, in accordance with this opinion, an auditor will be appointed by the court to make such a finding. No other adjustment of accounts is deemed necessary, but such adjustments are made to apply to all members of the association, whether plaintiffs or not.

"The association will be enjoined from making purchases of rice in the future, whether mortgaged or not, and will be ordered to make advances only as found herein to be in compliance with the law.

"The association will be enjoined from proceeding in any other court to collect penalties from plaintiffs for alleged breach of their contracts to deliver rice up to this date, but plaintiffs will be required to specifically perform their contracts in the future by delivering their rice to the association.

"The cost of this proceeding, including the stenographer's fees, will be taxed against the association."

A decree was entered of record in accordance with the findings of the chancellor. The plaintiffs have duly prosecuted an appeal to this court, and the defendant has been granted a cross-appeal.

*Charles A. Walls* and *George C. Lewis,* for appellant.

*Joe T. Robinson, A. G. Meehan, C. E. Pettit* and *W. A. Leach,* for appellee.

HART, J., (after stating the facts). At the outset, it may be stated that the validity of contracts under our Co-operative Marketing Act was sustained in the *Arkansas Cotton Growers' Cooperative Association* v. *Brown,* 168 Ark. 504, 270 S. W. 946, and it was held that equity has jurisdiction to grant relief where legal remedies are inadequate. In addition to the authorities cited in the opinion and by the reporter in a footnote, we refer to the case-notes in 25 A. L. R. 1113 and 33 A. L. R. 247, for a full discussion and review of the decisions of the various courts of the different States on the subject of cooperative marketing of farm products by producers' associations.

In *Brown* v. *Staple Cotton Cooperative Association,* 132 Miss. 859, 96 So. 849, the validity of contracts of a cotton growers' cooperative association was upheld, where its declared purpose was to promote, handle and encourage the marketing of cotton intelligently, minimizing speculation and stabilizing the market. The court said:

"The plan of appellee association, considered in connection with the marketing and association contracts between appellee and its members, does not undertake to fix prices of long staple cotton. The outstanding purpose is to promote intelligent warehousing and marketing of such cotton. Appellee association goes out in the open market and hunts purchasers who compete against each other. It is simply a sales agency or a plan for group marketing. It is true it has large powers, but not even all the power at one end of the bargain. One

of the main purposes is to prevent long staple cotton growers from being forced, on account of their financial necessities, to dump their cotton on the market for the producer the year round, instead of for only three or four months. Another object is to save expense to the producer by means of having large quantities of long staple cotton stored, classed, and marketed by appellee association, instead of by thousands of producers, who know nothing about classing cotton. Appellee association, under the arrangement, is able to sell direct to the mills as well as to others."

In all the cases cited and referred to, it is recognized that the purpose of such associations is to secure for their members the advantages of cooperative bargaining in selling their crops. It has been well said that such associations, wisely and economically administered, tend to work to the advantage of the producers, and that the pooling arrangement tends to stabilize prices, and, in the long run, to secure to the members better prices by affording them better and cheaper warehouse facilities and by enabling them, when necessary, to sell direct to the manufacturers. Again, the associations enable them to sell in larger markets, extending over a much longer period of time and a greater area of territory. It was found out that, individually, the producers could not dispose of their crops at a fair and reasonable price. Those in debt were forced to sell, as fast as their crops were gathered, to local buyers. All were forced to sell in the local markets and to store their products in warehouses furnished by prospective buyers. The buyers, by combining, might practically eliminate competition and thus greatly depreciate the market value of the crops. Single-handed, the producers could not successfully combat this evil; collectively, the producers, by pooling their products and placing them in the hands of a selling agency selected by themselves, might obtain better prices. By acting together, they could greatly lessen the cost of storing their products until ready to sell and could greatly lessen the cost of sale by using the same selling agencies,

and could better secure competitive bidders by being able to sell in larger or smaller quantities, at their option, through the same selling agency.

The decisions in the cases cited and referred to above recognize that, in construing contracts of this kind, the existing conditions and the situations of the producers must be considered. This is merely an application of the general rule of construction in ordinary contracts. It is a cardinal rule of construction that the meaning of a contract is to be gathered from the instrument as a whole, and, in construing a contract, words should be given their usual and ordinary meaning when this can be done.

It is also a fundamental rule of construction that courts may acquaint themselves with existing conditions and place themselves in the same situation as the parties to the contract, so as to view the attendant circumstances as they viewed them, in order to ascertain the intention of the parties from the language used in the contract. *United States Fidelity & Guaranty Co.* v. *Sellers,* 160 Ark. 599, 255 S. W. 26; *Alf Bennett Lbr. Co.* v. *Walnut Lake Cypress Co.,* 105 Ark. 421, 151 S. W. 275; and *Arlington Hotel Co.* v. *Rector,* 124 Ark. 90, 186 S. W. 622.

The chancellor found that there had been certain breaches of the marketing contract by the officers of the association, but that the violations of the contract were due to a mistaken or wrongful construction of the contract. The chancellor was of the opinion that any wrong done the members could be corrected by a restatement of the accounts, and that a violation by the officers did not relieve the members from a further compliance with their contracts to deliver their rice to the association, nor did the wrongs justify the appointment of a receiver.

Counsel for appellants contend that this rule is wrong; they quote the well-established rule that the one who first breaks a contract cannot maintain a suit to recover upon it, and that the failure of one party to comply with the contract releases the other party from per-

formance. *Jerome Hardwood Lumber Co.* v. *Beaumont Lumber Co.,* 157 Ark. 220, 247 S. W. 1059, and cases cited.

The reason for the rule is that, where covenants are mutual and dependent, the failure of one party to perform absolves the other and authorizes him to rescind the contract. *Emigrant Co.* v. *County of Adams,* 100 U. S. 61.

There are certain well-known exceptions to the general rule, and one of them is the effect of a failure to perform an independent covenant. In 5 Page on Contracts, § 2976, the rule is stated as follows: "From the nature of the independent covenant, the essential characteristic of which is that the parties intend that the performance thereof shall not depend upon the performance of the adversary party, it follows that the breach or nonperformance of such covenant does not operate as a discharge of the covenants which, by the terms of the contract, are to be performed by the adversary party. If such independent covenant is broken, the adversary party has a right of action for damages thereon, but he cannot treat such breach as a discharge."

In *Taylor* v. *Patterson,* 3 Ark. 238, it was held that, in the case of independent covenants, either party may recover damages for a breach of the covenant in his favor, and the nonperformance of one is no excuse for the other. See also *Desha* v. *Robinson,* 17 Ark. 228, at 243.

In principle, the effect of the failure of the association to perform certain covenants of the contract is no wise different from the failure to perform an independent covenant.

As will appear from our statement of facts, both the statute and the contract provide for an injunction to prevent a breach, and for liquidated damages in compensation therefor.

The services of the association in pooling and marketing the rice of its members were to be furnished continuously during the life of the contract. Each season's

business was separate and distinct. Manifestly, each member signed the contract upon the faith of the signature of the other members.

Appellee has no capital stock, and is not operated for profit. The association is not allowed to purchase, handle and sell rice, except for its members. It is dependent for its existence and an opportunity to serve its members upon their observance of their contracts and upon the continued existence of the association. Members join the association for a stated number of years, and are permitted to cease growing rice at any time they see fit to do so. New members are being admitted year by year. The purposes of the association are fully set out above, and need not be recited here. In consideration of the members' promises in signing the "marketing contract," the association agrees specifically to receive, handle and market the rice of its members and to settle therefor according to specified terms.

Appellants signed the "marketing contract" with the other members of the association. Hence appellants' agreements were made in consideration of like agreements of the other members and for their mutual advantage. If appellants could be absolved from the performance of the contract because the officers of the association had committed breaches of the contract in certain respects, it is certain that the other members of the association would suffer by this course. The action of the appellants in rescinding the contract would tend to cripple the association and thereby harm the other members of it.

To illustrate, if a sufficient number had joined in this suit, and it should be held that they were released from a performance of the contract because of the breaches committed by the officers, this might result in destroying the association and in depriving those remaining in it of the advantages all members expected from joining the association. It will be noted that the members of the association joined for a specified number of years, and doubtless in the expectation that all the

members would remain in the association for the specified time.

The "marketing agreement" contains a clause that a member may cease to grow rice at any time while a member of the association.   It is fairly deducible from the entire contract that it was contemplated between the parties that all the members who did grow rice should deliver it to the association to be marketed, during the period of time provided for in the contract.   Under these circumstances, we think the chancellor was right in holding that the breaches of contract in this case, on the part of the officers of the association, did not absolve the members from delivering their rice to the association to be marketed during the period of time stipulated in their contracts.

This question has not been directly passed upon by this court or by any other court of last resort to which our attention has been called, but we think our present holding is in accordance with the principles of law laid down in cases of this sort cited above.   Any other rule would certainly impair the usefulness of such associations, if it did not wholly defeat their purpose and destroy them.   It will be noted that, in construing similar contracts, it has been held that, while the contract was one which could not be specifically enforced in equity because such course would require the performance of continuous duties, still this did not prevent the courts from entering injunctions restraining its breaches, which indirectly accomplish the same result.   In addition to the cases above cited, see *Pratt* v. *McCoy,* 128 La. 570, 54 So. 1012.

It follows that the chancellor's holding on this branch of the case was correct.

The chancellor held that the reserve of two per cent., deducted each year for credits and general purposes, can be used to pay only contingent expenses of the crop for which it is collected, and must, after the contingent expenses of that season are paid, be returned to the members who paid, in proportion as they paid it.   The chancellor, however, held that the unexpended balance

of this reserve cannot be returned to the members until the season's business has been entirely disposed of.

Counsel for appellee challenge the correctness of this holding and contend that the reserve should be construed as a permanent continuing fund and corporate asset. They insist that such construction is necessary to make the association a complete workable organization.

The correctness of the holding of the chancellor depends upon the construction to be placed upon article 6 of the "marketing agreement," which is set out in our statement of facts, and need not be repeated here. The majority of the court is of the opinion that the contention of counsel for appellee should be sustained.

Bearing in mind the general rule for the construction of contracts above announced, we all agree that the intention of the parties should be gathered from the language used as a whole, and that the paragraph should be read in connection with the remainder of the contract and in the light of the situation of the parties when the contract was executed. Each member signing the contract agrees to be bound by its terms for a designated number of years. Members may cease to grow rice during a particular year or years during the life of the contract. New members are constantly coming in. The success of the association in accomplishing the purpose of its organization depends upon its continued existence. The accumulation of a moderate reserve will enable the directors to have at their disposal a sum to be used whenever occasions of sufficient urgency arise. It is pointed out that this is the usual practice in commercial undertakings, and it is equally desirable in cooperative ventures.

That this meaning was intended is shown by the clause "and of reserves for credits and other general purposes." It is said that this language, when read in connection with the context, evinces an intention on the part of the parties to the contract that the officers of the association should retain out of each year's operations a certain percentage to be set aside as a surplus or reserve fund to be used in case of need.

Such is the line of reasoning made by counsel for the association and adopted by the majority of the court. It is said that the words "annual surplus," used in the last sentence of paragraph 6, is not the unused portion of the reserve but is the sum remaining after all deductions have been made.·

On the other hand, Judge·Humphreys and I think the better view of the matter is that urged by counsel for appellants and adopted by the chancellor. We think the language used clearly indicates that each season's pool was to take care of itself, and that it means that the reserve belongs .to the members who contribute it, and any surplus remaining after the close of the season's business must be distributed to them.· We think the words "annual surplus" refers to a sum to be kept by the association, after the sale of the rice and the payment of the proceeds of sale to the rice growers, until the final close of .the season, in order to meet unforeseen liabilities which might arise from the conduct of that year's business.

As stated by counsel for appellants, the evident purpose of the contract as a whole is that the association shall sell the rice of its members as cheaply and expeditiously as practicable and pay the proceeds to its members, and that the "annual surplus" was to meet unforeseen liabilities for the current year and not as a reserve fund for future years. ·

In this connection we may say that we all agree that, if the directors of the association should undertake to reserve an amount greater than appeared to be reasonably necessary to meet unforeseen emergencies, the members might enjoin them from collecting more than appeared to be reasonably necessary for an economical administration of the affairs of the association.

It results from the view of the majority that the use of the reserve provided for in article 6 of the "marketing agreement" is not limited to the year's business in which it is collected, and that an annual distribution thereof is not required.

The chancellor held that the method of pooling rice in the clean adopted by the association was warranted under the terms of the "marketing agreement." It was the contention of counsel for appellants that the contract means that the rice should be pooled in the rough. According to the view of the association, a pool constitutes a volume of rice of a given quality, variety and grade, handled throughout the season, and its practice in pooling clean rice was to put rice of like variety, grade and quality into one pool, each pool to be for the full season. It will be noted that articles 5, 6, 7 and 8 all deal expressly with the question of pooling and selling the rice of the members, and the correctness of the court's ruling depends mainly upon the interpretation to be given these articles.

Articles 5 provides that the association shall pool or mingle the rice of the growers with that of a like variety, grade and quality delivered by other growers. It also provides that the grading or classification of the association shall be conclusive.

Article 6 provides for the resale of such rice by the association, together with rice of like variety, grade and quality, delivered by other growers, for the best price obtainable.

Article 7 provides that the grower agrees that the association may handle, in its discretion, some of the rice in one way and some in another; may sell some in the rough or otherwise; may contract for or effect the milling of all or any part thereof, and sell the finished product to the trade or otherwise.

Article 8 provides that the association may sell the rice within or without the State, directly to millers or brokers or the trade, or to the public, or otherwise. This article provides that the association may sell all or any part of the rice, to or through any agencies, now or hereafter established, for the cooperative marketing of the rice of growers in other States throughout the United States.

Thus it will be seen that the largest discretion in the premises is given the association. The contract not only does not by implication or otherwise restrict or limit the powers of the association to grading and selling the rice in the rough, but, by necessary implication, as well as by express language, gives the association the authority to sell rice either in the rough or after it has been cleaned or run through the mill.

When the contract provides that the association may effect the milling of all or any of the rice and sell the finished product to the trade or otherwise, this would seem to confer express authority to form a pool of the rice in the clean.

Again, the contract gives the association the authority to sell the rice to or through any agency established or to be established in any other State for cooperative marketing. It is a matter of common knowledge that this could not be as successfully done if the rice was to be pooled in the rough. In such state, it might not be practicable to ship it to a selling agency or purchaser in another State.

For these and other reasons which might be given, we are of the opinion that the holding of the chancellor, that the association was given the authority in the contract to pool the rice in the clean, was correct.

The chancellor correctly held that the association could not purchase rice at all, whether mortgaged or not, and that the purchase of mortgaged rice in 1923-24 was a violation of its contract with its members. The correctness of his decision on this branch of the case is apparent when the "marketing agreement" is read in connection with the act authorizing cooperative marketing associations. As we have already seen, similar acts authorizing pools of farm products have uniformly been upheld by the courts of last resort of numerous States, as against various constitutional objections, and as not being monopolies or contracts in restraint of trade.

Under the articles of incorporation of the association, which followed the terms of the act under which it

was organized, the association was organized for the purpose of pooling and selling the rice grown by its members, and no person was eligible to membership except rice growers. The articles of incorporation do not contemplate that the scope and purpose of the association could be so extended as to become a business corporation conducted for profit. The act authorizing the incorporation of the association contemplates that the association may only make contracts to pool and sell the product of its members. The "marketing agreement" by its terms follows the statute, and does not contemplate that the association should purchase rice from any person or persons at all.

The contract also expressly provides that the association may make advances to its members under certain stipulated terms or conditions. In carrying out the power thus conferred, the chancellor properly held that the association might pay off a mortgage, when, in good faith, it believed the value of the rice to exceed the mortgage, and take the mortgaged rice upon the same terms and conditions as the rice of other members. It was also rightly held that, if the rice was sold for less than the amount of the mortgage, the loss must be borne by the mortgagor. In this connection it may also be stated that the chancellor properly held that, in making advances, the association should do so to all the members at the same percentage, or, if this was not done, the member should pay interest on the amount of advances received.

On the subject of the appointment of a receiver but little need be said. As we have already seen, it is conceded that the finding of facts made by the chancellor is sustained by the evidence in the record. The chancellor held that the facts did not show such fraud and mismanagement of the affairs of the association as would justify the appointment of a receiver. The court expressly found that the cost of milling the rice was not shown to be excessive under the existing conditions, and that the directors did not abuse their discretion in the

payment of attorneys' fees and salaries to officers and employees.

The general rule is that courts proceed with great caution in the appointment of receivers to take charge of the affairs of a corporation, for the reason that such action amounts to a practical displacement of the directors in managing the affairs of the corporation. It may also be said that the rule is not to appoint a receiver when the specified acts complained of may be remedied by injunction or are capable of redress by other available means. Hence the chancellor did not err in refusing to appoint a receiver.

The chancellor correctly held that the $54,872.69 which was deducted by the association from the first year's milling and storing rice, was wrongfully deducted and spread over the five-year period of contract remaining. During the first year of its operation the association handled rice for persons who were not members as well as for those who were members. It sold a large amount of rough rice, which was not pooled, on which it charged a commission of 10 per cent. As we have already seen, the association had no right to handle the rice of persons who were not members of the association, and no right to sell rough rice without pooling it, and no right to sell rice on commission.

These matters were all foreign to the object and purposes of the association, and were extremely hazardous. Such a course of conduct, if pursued, would ultimately tend to defeat the purpose of the organization, which was cooperative marketing, and might destroy the organization. Any member of the association could have obtained an injunction stopping it. Such a course of conducting the business of the association did not result in a loss to the members, and, as a necessary consequence, no damage was suffered. Indeed, this particular transaction resulted profitably to the association, and, in the final settlement of the season's business, $54,872.69 was on hand to be distributed. As we have already seen, the contract does not contemplate that there

should be an accumulation of a surplus fund, except the reserve fund provided for in article 6 of the contract, as pointed out in the opinion. In other respects, the proceeds of sale at the close of the season, and, in this particular instance, the profits made, are to be shared by the members of that season, and are not to be carried forward into succeeding years and spread over the remaining five-year period of the contract and distributed accordingly.

Complaint is made that the chancellor taxes the costs against the association. In equity, the granting of costs rests entirely within the discretion of the court. The principle which should guide the discretion is that the party who, by his fault, has unnecessarily involved another in litigation, should pay the cost thereof; and it does not always follow that the unsuccessful party was at fault, or that the litigation was unnecessary.

In the case at bar the chancellor found that the association had breached its contract with its members in several important respects, and only denied them the relief asked for by them. Considering the matter in all its aspects in connection with the attendant circumstances, we cannot say that there is a plain case of an abuse of discretion in the chancellor's allowance of costs. *Temple v. Lawson,* 19 Ark. 148; and *Penix v. Pumphrey,* 125 Ark. 332, 188 S. W. 816.

The costs upon the appeal stand on a different footing. The decision of the chancellor in the main has been affirmed. The reversal of the chancery court as to the disposition of the reserve fund inures to the benefit of appellee. Under all the circumstances, the appellee will be allowed to recover the costs of the appeal.

As stated by the chancellor, counsel on both sides have clearly and, with as much conciseness as practicable, presented the issues, and we could do little except adopt their reasoning, which we conceive to be just and plainly warranted by the "marketing agreement," when read and interpreted in connection with the articles of incorpora-

tion and the statute under which they were authorized. The result of our views is that the finding of the chancellor was correct, except as to his holding on the reserve fund, as indicated in the opinion.

It follows that the decree will be reversed, and the cause remanded with directions to the chancery court to hold the reserve fund to be a continuous permanent fund of the association, as held in this opinion.   In all other respects the decree will be affirmed.