311 So.2d 183 (1975)
Flora Flynn FURZE, for Herself and As Guardian Ad Litem for Mary Lewis and Alice Ellingson, Etc., et al., Appellants,
v.
LAKE REGION PACKING ASSOCIATION, INC., et al., Appellees.
No. 73-181.
District Court of Appeal of Florida, Second District.
April 18, 1975.
*184 Robert E. Austin, Jr., Davis, McLin, Burnsed & Austin, and Henry L. Pringle, Leesburg, for appellants.
Christopher C. Ford, Tavares, for appellees.
McNULTY, Chief Judge.
As a tax exempt cooperative, appellee Lake Region markets the citrus produce of its patrons for a charge, remitting the proceeds from fruit sales to the respective growers.
Appellants, who are non-current, former members of the cooperative, brought this class action seeking sums concededly withheld from them by the cooperative in a reserve account. Concluding that the time for repayment was to be determined by the directors' business judgment, the trial court found neither an abuse of discretion nor breach of trust in the directors' refusal presently to repay the accounts. We agree; but we must ultimately remand for further consideration as will more fully hereinafter appear.
At the outset, however, an overview of the problem herein is almost essential to an understanding of our conclusions herein. We comment first on the pertinent cooperative function. While a cooperative form of organization provides advantages unavailable to the independent producer, it requires working capital and sufficient reserves to offset losses due to freezes or other contingencies. To establish such reserves a cooperative might either borrow money from outside sources (debt financing) or retain sums from members and patrons in order to accumulate working capital and reserves over a period of time (equity financing).
In the case before us, since at least 1925 Lake Region has pursued the latter course and has charged its patrons such a fee, in addition to costs, in order to do so.[1] Earnings withheld by the cooperative as contributions to its reserve account were recorded as non-cash "allocations" to member and patron accounts. At the beginning of each fiscal year the board of directors set charges for the various services it was to perform for members and patrons during *185 the coming year. At the end of that fiscal year net margins or net losses were determined by subtracting operating and other costs from the income received from charges. The difference was added to or subtracted from each member or patron's allocated reserve account in an amount proportionate to his transactions with the cooperative during that year. Although no definite schedule was followed, excessive reserves were used to redeem the earliest unrefunded allocations on approximately a ten to twelve year cycle. The directors on these occasions of redemption, pursuant to their duties as set forth in the by-laws, "declared" such excess.
A 1962 amendment to the internal revenue code, however, has caused considerable change in the cooperative's practice. As a consequence thereof, patrons' contributions to reserves since 1963 have designedly totaled less than the cooperative's net margins, and, with equal design, no contributions have been made since 1968. Moreover, no reserve allocations have been redeemed since 1963 and several letters by the president (now chairman of the board) clearly indicated that, until changed, the tax ramifications of the amendment would preclude repayment. (We will more fully discuss the tax problem later.)
In the past, when considering like quandaries, the courts of sister states have generally recognized that absent special circumstances neither current nor former members have a legal right to enforce immediate repayment of equity credits, such as those allocated to appellants.[2] One commentator, however, has analogized the plight of ex-members seeking repayment to that of non-participating, perferred stockholders seeking dividends: while no legal right to payments vests until the board authorizes a refund, an action for abuse of discretion could be brought under appropriate circumstances.[3] Similarly, although reticent to specifically articulate such "appropriate circumstances," several courts have suggested that judicial review of cooperatives' refusal to redeem would be available if the directors' refusal to repay constituted an abuse of discretion or was based upon fraud, illegality or inequity.[4] Florida decisions to date suggest that although repayment rights do not vest until dissolution,[5] applicable by-law provisions may require earlier repayment.[6] It would appear in sum, therefore, that an abuse of the directors' discretion granted under the by-laws may be a predicate for judicial relief in the premises.
We look first, then, to Lake Region's by-laws. Article XIII thereof provides that contributions to reserves, in the nature of "loan capital," shall be separately indicated on the cooperative's books. We have already pointed out that when in any given year the association operates at a net loss, the loss is to be charged to the reserve account and the allocated accounts of patrons reduced accordingly on an equitable basis. It is further provided, however, that when there are profits the directors in their discretion may find the reserves to be "excessive" and, to that extent, the by-laws mandate that they are to apply such excess toward repayment of the oldest unexhausted reserve contributions. Additionally, of course, upon dissolution, reserves must be distributed ratably to patrons after other debts are retired.
Thus, the by-laws establish a hybrid indebtedness referred to as loan capital. Although *186 initially fixed in amount, the obligation may be reduced by financial losses intervening before repayment, or upon dissolution, by higher priority debts. Moreover, as to the oldest reserve contribution, the date and amount of repayment are uncertain since their liquidation depends upon the discretionary determination by the directors of excessiveness of reserves.
Now, it must be pointed out at this point that the appellants do not seek repayment herein of specific allocations; they seek only to force the cooperative to revolve its reserves which, incidentally, may well indeed result in repayment. Since, however, they do not allege that the directors have failed to apply any "excessive" reserves to repayment of past obligations, pinpointing a specific by-law mandate which requires present redemption is an elusive task. While appellants unquestionably have a right ultimately to repayment, the directors' discretionary business judgment necessarily determines not only the setting of charges which inevitably affects the accumulation of reserves to begin with, but also the point at which such reserves become excessive and thus amenable to redemption of those past obligations. Nevertheless, the testimony of Lake Region's incumbent chairman of the board and accountant conceded the existence of such a responsibility to redeem. Although not expressly required by the by-laws, such an obligation would be consistent with the general tenet that current patrons finance the cooperative's current operations. Moreover, we think it implicit in the scheme outlined by the by-laws that the directors may not frustrate the appellants' right to repayment by continually setting charges at a level too low to allow accumulation of "excessive" reserves.
On the other hand, it is obvious that the decision as to when and in what amounts repayments should be made must be made on a year to year basis. Here, the record indicates that at the time of trial the reserves were not excessive and current margins were clearly not sufficient to allow repayment. We can't tell, however, whether these conditions were caused, as they well could have been, by temporary circumstances such as freeze losses or extensive debt financing for capital improvements. From this, and because the bylaws require no definite schedule of repayment, we must conclude that appellants' proof is insufficient either to establish a current abuse of discretion on the part of the directors or to support an order of immediate repayment out of current reserves.
At this point, other things being equal, we would ordinarily be compelled to affirm. But other things here are not equal. Appellants' rights in the premises are apparent; and if they can't get redress for them now they may be compelled, perhaps annually, to seek redress in innumerable subsequent suits in which their ability to demonstrate an abuse of discretion on the part of the directors would hardly be any greater. In order to seek a viable solution in the instant suit, therefore, we think it now propitious to resolve a few of the apparent stumbling blocks to an amicable settlement of the mutually recognized problem herein with a view toward resubmission of the matter to the parties involved who, hopefully, may come to agreement.
Because the record indicates that future refusal to repay might be predicated solely on the tax and/or competitive (i.e., the competition of other cooperatives) consequences of repayment under the 1962 amendment to the IRC, we now discuss these points.[7] Initially, as to the tax problem proper, prior to 1962 net margins were not taxable as cooperative profit if they were allocated to members or patrons on a patronage basis.[8] The clear intention of that prior law was that such allocations would be taxable as against the individual members and patrons. However, since the *187 time for repayment of such non-cash allocations was uncertain and the amount subject to diminution, the courts ruled that the members or patrons realized no taxable income from allocations until they were redeemed.[9] By the 1962 amendment, the code was modified to insure that the earnings of the cooperative were taxed in a given year at a single level. That is to say, the cooperative now may still deduct amounts distributed in cash to members or patrons but may only deduct noncash allocations if, since 1962, patrons have consented to recognize them as current income to themselves at their face value.[10]
Lake Region argues that the 1962 revision will result in double taxation on reserve repayments. Current earnings must now be taxed either as against current member patrons or as cooperative profits, therefore, they point out, if these earnings are used in part to redeem pre-1962 reserve allocations they will also be taxed as present income to the recipients, some of whom are still current members. Properly viewed we do not think this is double taxation. To be sure, current patrons (or alternatively the cooperative) are paying on the cooperative's current earnings; but the holders of prior allocations, whether present members or not, are paying tax for the first time on income retained by the cooperative many years earlier. The real difference is that the post-1962 earnings are taxed at the time of allocation, while the pre-1962 allocated earnings are not taxed until redemption.[11]
We recognize, nevertheless, that the 1962 amendment will create a problem for those current members who also hold pre-1962 reserve allocations. They will be forced to recognize both current allocations and redemption of past allocations in the same year. This may well result in a distortion of their taxable income, particularly since they will be required to pay tax on income they will not currently receive to the extent it is held in reserve. But, while freezing pre-1962 reserves would avoid the problem as to them, it precludes repayment to ex-members such as appellants who no longer benefit from the cooperative and, additionally, it gives a "free ride" to new members[12] who obviously benefit fully from the refusal to declare an excess of reserves for redemption purposes.
Appellee finally urges that the only alternative to nonpayment to appellants would be the setting of charges at rates higher than those competing cooperatives. This would, it argues, result in defections of members and patrons to other cooperatives.[13] We counter by saying that if Lake Region's competitors were under similar pressures to refund equity credits, the increase in charges would likely be industry wide and obviate the problem. Moreover, by virtue of its apparent large size and excellent facilities Lake Region should still be able to compete because of its established efficiency.[14] In any event, it appears to us that the competitiveness of the industry seems unlikely to change so quickly as to become a serious factor in the solution of the problem before. In our view, yielding to the fear of this latter consequence, like the tax argument, is more likely to effect a forfeiture rather than a postponement of the reserve credit repayment sought by appellants.
*188 In view of all the foregoing, therefore, we again say that we think the trial court was correct in denying immediate relief to appellants on the record before him. It is clear, however, that the equities cry out for redress. We've indicated that the tax and competitive consequences appear to have been the biggest deterrent to a viable solution; but we have articulated, hopefully, that we do not think either consequence should operate as a perpetual or, for that matter, a continuing bar to redress. We now say that we think the parties should go back to the drawing board and see if they can come up with a workable solution to be submitted to the court, if necessary, for judicial implementation. As should be apparent, the matter is a very complicated and complex one, and the expertise of the parties themselves appear to us to be a necessary expedient to the solution. For this reason we think the parties should have the first shot at it. To assist in this regard, and by way of suggestion only, we have set out in a footnote certain apparently viable alternatives, one or any combination of which might be agreed upon.[15] The parties themselves may well reject them all and substitute their own. So be it. The solution is the thing.
In view whereof, the findings of the trial court should be, and they are hereby, affirmed. The judgment is set aside, however, and the cause remanded with directions that the parties be required to seek a viable solution to the problem inherent herein and, if deemed necessary by the parties, submit such solution for judicial implementation. If, however, the parties cannot agree within such time as the trial court may deem reasonable, the court may, at the instance of appellants and in such subsequent proceedings as the court may deem propitious, formulate and order such solution as to him may seem equitable and just in light of our opinion herein.
Now, because this appears to be a case of first impression and one which may have considerable impact on Florida agriculture generally, and upon the citrus industry in particular, we consider it appropriate to say, and do hereby certify, that we this day pass upon a question of great public interest.
Affirmed in part, reversed in part, and remanded for further proceedings in accordance herewith.
HOBSON, J., concurs.
GRIMES, J., concurs specially with opinion.
GRIMES, Judge (concurring specially).
I was originally disposed to dissent because I had difficulty finding in this record a legal as opposed to a moral obligation on the part of the cooperative to repay the allocated reserves except upon dissolution. There is nothing in the charter *189 or bylaws which specifically requires more than the exercise of the directors' discretion in determining whether to redeem. Thus, it may be argued that the interest of the patrons in the reserve is more nearly in the nature of a stockholder's interest than that held by a creditor. See Claassen v. Farmers Grain Cooperative, Kan. 1971, 490 P.2d 376.
However, for many years prior to 1962 the cooperative was entitled to treat the allocated reserves as nontaxable. The predicate for this tax treatment was the existence of an obligation to pay. American Box Shook Exp. Ass'n. v. Commissioner of I.R., 9th Cir.1946, 156 F.2d 629; Southwest Hardware Co., 1955, 24 T.C. 75; Home Builders Shipping Ass'n., 1931, 8 B.T.A. 903. By having filed its returns so as to obtain this favorable tax treatment, Lake Region necessarily acknowledged that its allocated reserves constituted an obligation to the patrons. Therefore, I concur in Judge McNulty's opinion calling for the cooperative to come up with a reasonable solution as to how this obligation shall be satisfied.
NOTES
[1] Originally a 10 cents per box "retain" was charged and retain certificates were issued to contributing patrons. Virtually all of these certificates have been refunded; none are involved in this suit. Sometime in the early 1930's the cooperative shifted to a system of allocated reserves, with book allocations made in lieu of handing out retain certificates.
[2] See generally Annot. 50 ALR.3d 435, 490-96 (1973); 18 Am.Jur.2d Cooperative Associations § 15. Such rights mature upon dissolution, however. See Ozona Citrus Growers' Ass'n v. McLean, 1935, 122 Fla. 188, 165 So. 625; McCauley v. Arkansas Rice Growers' Co-op. Ass'n, 1926, 171 Ark. 1155, 287 S.W. 419; Weise v. Land O'Lakes Creameries, Inc., Iowa 1971, 191 N.W.2d 619; Driscoll v. East-West Dairymen's Ass'n, Dist.Ct.App.3d 1942, Cal. App., 122 P.2d 379, on rehearing, 52 Cal. App.2d 468, 126 P.2d 467.
[3] Packel, The Law of Cooperatives 233-36 (3d ed. 1956); cf. 12 Fletcher, Cyclopedia of Corporations § 5451 (1971 rev.).
[4] See Evanenko v. Farmers Union Elevator, N.D. 1971, 191 N.W.2d 258; cf. Placerville Fruit Growers' Ass'n v. Irving, Dist.Ct.App.3d 1955, 135 Cal. App.2d 731, 287 P.2d 793; Claassen v. Farmers Grain Cooperative, 1971, 208 Kan. 129, 490 P.2d 376.
[5] See Ozona Citrus Growers' Ass'n v. McLean, 1935, 122 Fla. 188, 165 So. 625.
[6] See Adams v. Sanford Growers' Credit Corp., 1938, 135 Fla. 513, 186 So. 239.
[7] For a history and overview of the area see Blair, Taxation of Farmers, 28 J.Tax. 180 (1968).
[8] Id. at 182-83.
[9] See Commissioner v. Carpenter (5th Cir.1955), 219 F.2d 635; Long Poultry Farms v. Commissioner (4th Cir.1957), 249 F.2d 726.
[10] Int.Rev.Code of 1954 §§ 1381-83, 1388. The cooperative must also distribute at least 20% of the total allocation to each member in cash. Id.
[11] See Blair, supra n. 8, at 181.
[12] Id.
[13] The ten-year marketing contracts may be terminated each year if the cooperative is notified 30 days prior to its annual shareholders' meeting.
[14] We note here, parenthetically, that the spoken-of established facilities and efficiency were made possible in no small measure by the past sacrifices and early efforts of old patrons such as appellants.
[15] The directors may:

1. Set charges a small but reasonable per cent above estimated costs to begin reaccumulating reserves which can be classified as "excessive."
2. Reserve allocations could be redeemed from this "excess" but at a slower rate, thus effecting a "stretching out" of the repayment cycle and a softening of the tax consequences.
3. Rather than redeeming immediately out of current income, and forcing many current members to "double-up," the income could be placed in reserves in one year, accumulate to another, and then be used to redeem allocations in a subsequent, more propitious year:
a. For instance refunds could be made out of accumulated reserves in fairly large amounts in years in which overall profits to the growers are low  thus refunds might exceed any current earnings withheld, and the patrons' income would also not exceed its normal level.
b. Alternatively, the cooperative might alternate years of withholding current income and redeeming reserve allocations so that both do not occur in the same year; or at least refund in a year when net margins are very low.
4. A further alternative is suggested at page 181 of the Blair article, supra n. 8, called "the adjusted balance method" which may still be approved by the Commissioner of Internal Revenue.